[No. 13643. Department Two. — December 22, 1890.]

## HENRY A. GUERNSEY, RESPONDENT, v. WEST COAST LUMBER COMPANY, APPELLANT.

CONTRACT — ACCEPTANCE OF GOODS — WAIVER OF DEFECT. — If a party accepts and pays for part of a quantity of goods delivered under a contract, without reserving the right to object subsequently, and does not offer to return the goods delivered, but retains them, he waives any defect in their quality, and he cannot make such defects a ground of objection to goods which are to be subsequently delivered, and which are in accordance with the contract.

APPEAL from an order of the Superior Court of San Bernardino County refusing a new trial.

The facts are stated in the opinion.

*Charles J. Perkins*, for Appellant.

*T. J. Fording*, for Respondent.

HAYNE, C. — This was an action for damages for the breach of a contract to buy lumber. The contract provided that the defendant should buy all the lumber "of good, merchantable quality" which should be manufactured by the plaintiff during the year 1888 at his mill in San Bernardino County, and contained the following clause: —

" Said lumber shall be of such sizes *as are usually required for the market, and shall be designated by Guernsey,*

regard being had to a due variety of sizes, so as to meet the general requirements of the market, except that *the company may give orders for any required sizes usually cut.*"

Under this contract, the plaintiff delivered lumber to the defendant until the middle of August, and, with certain unimportant exceptions, the defendant received and paid for the lumber so delivered. About that time the employees of the defendant informed its general manager that some of the lumber which was being delivered was not thick enough, and he instructed them "to have it remedied." No order for any particular size was given to the plaintiff; but he was informed that the lumber he was sending was too thin. He promised to attend to the matter, and his men continued to deliver lumber to the defendant, and the latter to receive and pay for it, until September 20th, when the plaintiff was notified that no more lumber would be received. The plaintiff thereupon sold the remaining lumber to other parties, and brought this action to recover the difference in price. The trial court found that the defendant's refusal to receive further lumber was without excuse, and gave judgment for the plaintiff, and the defendant appeals.

We think that since the defendant accepted and paid for the lumber delivered up to September 20th, without reserving the right to object to it subsequently, and does not offer to return it, but still retains it, any ground of objection to it which may have existed could not be a reason for refusing to accept subsequent lumber which was in accordance with the contract. The ultimate question, upon which the case must turn, therefore, is, whether the subsequent lumber was in accordance with the contract.

As we have seen, the contract provided that the lumber was to be of good, merchantable quality, and of such sizes as were usually required for the market, which sizes were to be designated by the plaintiff, subject to the right of the defendant to give orders for any sizes usually

cut.  Most of the evidence taken at the trial related to the question whether the lumber delivered by the plaintiff was "merchantable" within the meaning of the contract.  But this seems to have been understood by everybody as having reference, not to the quality, but to *the size* of the lumber.  Thus the local manager of the company testified as follows: "This Guernsey lumber was different from any other lumber that I have handled as merchantable lumber, *only as to thickness*.  I objected *on account of its being thin*.  It was n't good, merchantable lumber, *by reason of its being thin*."  All the witnesses use the term in this sense; and there is no pretense that there was any other ground of objection.

The question litigated therefore related to the size of the lumber usually required in the market.  The position of the plaintiff was, that lumber seven eighths of an inch thick was sufficient; and there was evidence in support of this view.  The position of the defendant was, that it was necessary that the lumber should be what was known as inch lumber.  The evidence shows, however, that there was not much exactness in the use of these terms.  Owing to the character of the timber of the locality, and to the usual method of manufacture, there was considerable difference in the size of the boards sawed at the same time from the same log.  In this regard, one witness testified as follows: "There is never a load that comes into the market that, were you to put your rule to it, every board would show the same thickness.  There never was a log on this mountain yet all the boards cut from which were of the same thickness."  Another witness said: "My experience has been that lumber which is cut as inch lumber very seldom comes an inch thick.  It would be probably a sixteenth less; and when it dries out, it would be more than a sixteenth less.  In fact, if you take dry lumber, it is sometimes three quarters of an inch, or a little more."  In most loads there would be a few very thin boards, which

it was customary to reject when delivered at the yard; and this course was pursued in this case.

Understanding the terms in the above sense, we think that, even if the standard of the defendant be adopted as the true one, the preponderance of the evidence is to the effect that after the complaint made in August, the plaintiff complied with his contract.

In sawing inch lumber, the usual way was to "move the set-works an inch and a third." After the complaint mentioned, the plaintiff's works were so moved. In relation to this, the plaintiff says: "I changed my head-blocks, and after that the lumber came out a full inch."

The lumber-man to whom the plaintiff sold his lumber after the defendant refused to receive it testified as follows in relation to it: "I consider this lumber to have been fully as good as any that I ever handled; in fact better than some I have been handling in the last two years, — that is, the average of it, — better timber. I mean by this, both the quality of the lumber and its manufactured condition. It was cut well, and it was good timber."

Another person from the same yard testified as follows: "What we received from Mr. Guernsey compared in thickness with the rest; if anything, his lumber was a little thicker than the other lumber that we received. I have applied the rule to measure the lumber. I can't say exactly just what it measured, but it was about as near an inch as any lumber we have received." Another lumber-man who had seen the lumber testified that the plaintiff's lumber compared favorably with that manufactured in the locality, and said: "I call it good inch lumber."

One of the plaintiff's employees who handled the lumber at the mill testified as follows: "The lumber that was cut in September was full inch. I saw nothing below an inch but what was thrown across the track. No

thin lumber, that I know of, came down at all." And the teamster who hauled the lumber to the defendant's yard testified that the last load, delivered before September 20th, " was good, average thickness; it was inch lumber."

It was also in evidence that the price of lumber had fallen below the contract price at the time of the refusal to go on with the contract, and that the defendant had engaged in a kind of work for which " they had to have extra thick lumber.".

We think that the evidence is amply sufficient to sustain the decision, and we therefore advise that the order denying a new trial be affirmed.

Foote, C., and Belcher, C. C., concurred.

The Court. — For the reasons given in the foregoing opinion, the order denying a new trial is affirmed.