[Civ. No. 6081. First Appellate District, Division Two.—June 19, 1928.]

NYE & NISSON (a Corporation), Respondent, v. WEED LUMBER COMPANY (a Corporation), etc., Appellant.

Taylor & Tebbe and Frank Thunen for Appellant.

Smith & Jacobson for Respondent.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from a judgment for damages secured pursuant to section 3311 of the Civil Code, for breach of a contract to purchase processed eggs.

Respondent is engaged in the commission poultry and eggs business at San Francisco. The appellant is a holding corporation for the Weed Mercantile Company, and operates a store at Weed, in connection with its lumber industry. In April, 1923, appellant contracted with respondent for the purchase of 750 cases of special processed eggs at 34 cents per dozen, to be delivered upon request, f. o. b. at San Francisco. The contract for these eggs was entered into through correspondence between the parties. April 5, 1923, appellant sent the following telegram to the respondent: "Would like to contract for 1000 cases of processed specials for fall delivery. Advise immediately terms of contract for this season." To which message respondent replied: "Answering,—terms same as last year; price 34c." These messages were followed April 10th by this letter from appellant: "Gentlemen, you might write us confirming sale to the Weed Mercantile Company of 750 cases processed eggs to be delivered as needed between the dates of October 1st, and February 1st, at a price of 34c per dozen, f. o. b. San Francisco." To which letter the respondent replied April 12th: "This is to acknowledge the receipt of your letter of the 10th inst., and confirm sale to the Weed Mercantile Company of 750 cases processed eggs, specials, to be delivered as needed between the dates of October 1st, 1923, and February 1st, 1924, at a price of 34c per dozen, f. o. b. San Francisco, Cal." Pursuant to this contract 128 cases of processed eggs were shipped, accepted, and paid for by appellant, leaving undelivered 622 cases containing 18,660 dozen of eggs, which appellant refused to accept and attempted to cancel the contract upon the ground that the eggs which had been received were unfit for use.

Several shipments of eggs were made to appellant prior to October 1st, which it insisted should not be charged against the contract for 750 cases above mentioned. The inference is that these eggs were entirely satisfactory and that the appellant was anxious to preserve the full benefit of its contract for 750 cases to be supplied at 34 cents per

dozen between October 1st and the following February. By the middle of November the price of eggs had slumped. William Russell, a dairy produce broker, testified: ". . . The decline (in the price of eggs) started about the middle of October, but in . . . November and December it commenced to show itself strongly. In January it became very strong. Up to and including February 1st, 1924, the market on processed pullet (eggs) went as low as 16c. I would consider a price of 20c . . . between January 23rd, and January 31st, 1924, to be a fair market value of the eggs." The 622 cases of rejected eggs were in fact sold on the open market the latter part of January for 20 cents to 22 cents per dozen.

By December 5th 128 cases of eggs had been shipped, accepted, and paid for by appellant. November 2d it began to complain of the quality of eggs received, saying in a letter of that date: "We have had several complaints from our steward that the eggs we were getting from you were not satisfactory. . . . In several cases we find we have lost quite a few eggs from each case. . . . Advise us if you will be in a position to fill contract for storage eggs stored in months of May and June? . . . " On December 14th appellant wrote respondent again, as follows: " . . . It is with regret that we will be compelled to request that you cancel our contract for processed eggs, as our steward has positively refused to use further shipments of storage eggs from you. . . . We will not be in a position to favor you with further orders this year on storage eggs." On December 18th respondent wrote appellant declining to cancel the contract for eggs which were undelivered; saying that the price of eggs had dropped materially since the execution of the contract, and that in the absence of instructions to the contrary respondent would sell the 622 cases of undelivered eggs on the market for the benefit of appellant and credit its account with the proceeds of sale. December 31st appellant replied, saying: ". . . We cannot use those eggs and will be compelled to insist that you cancel the contract as requested." Following this notice of intention to sell the eggs, the respondent did in fact sell the remaining 622 cases of eggs for the highest market price, receiving $3,906.60 therefor. The contract price of the undelivered eggs amounted to the sum of $6,344.40. The excess of the

contract price, over the proceeds of resale, therefore, was the sum of $2,437.80. Respondent thereupon brought suit for damages for this sum, for breach of contract. Judgment and findings were entered accordingly.

Appellant contends that (1) the evidence does not support the findings, that (2) the findings do not support the judgment and that (3) there was a breach of warranty as to the soundness of the eggs required by section 1768 of the Civil Code.

 The measure of damages for the breach of a contract to purchase personal property, when the title is not vested in the buyer, may properly be the excess of the contract price over the net proceeds obtained from a resale of the property. (Sec. 3311, Civ. Code; *Burner* v. *American Bar Q. Min. Co.*, 76 Cal. App. 767 [246 Pac. 74]; *Garcia & Maggini Co.* v. *Washington Dehydrated Food Co.*, 294 Fed. 765.) However, in the event of a breach of contract to purchase personal property, the seller may have an option to stand upon the terms of his contract, retain the property for the benefit of the buyer and sue for the purchase price, or the seller may retain and treat the property as his own, suing for the difference between the contract price and the market value of the property at the time and place of the agreed delivery thereof, or, as was done in the present case, the seller, acting as an agent for the buyer, may sell the property pursuant to section 3049 of the Civil Code, and sue for the difference between the contract price and the net proceeds of the resale. (*Burner* v. *American Bar Q. Min. Co., supra.*) Section 3311 of the Civil Code, provides: "The detriment caused by the breach of a buyer's agreement to accept and pay for personal property, the title to which is not vested in him, is deemed to be: (1) If the property has been resold, . . . the excess, if any, of the amount due from the buyer under the contract, over the net proceeds of the resale. . . ." In the present case the title to the undelivered eggs had not passed to the buyer for the reason that they were not in the possession of the seller at the time of the execution of the contract, but were received, candled, and packed for the appellant subsequent to that time. The terms of the contract do not specify nor imply that the parties intended an immediate transfer of title, which, indeed, under the circum-

stances was impossible because the produce involved in the contract was then neither ascertained, selected, accepted, nor stored with the seller. Title therefore did not then pass. (Sec. 1140, Civ. Code; sec. 1141, Civ. Code; 1 Williston on Sales, 2d ed., p. 520, sec. 258.) ■ The question of the immediate transfer of title to personal property depends upon the intent of the parties, which is to be ascertained from the contract. (1 Williston on Sales, *supra,* 525, sec. 261; *Turner, Kuhn & Fraser, Inc.,* v. *Jones,* 61 Cal. App. 732, 735 [215 Pac. 1033].) ■ Nor was it necessary that the seller should first give the buyer notice of the specific time and place of sale of the property. (*Garcia & Maggini Co.* v. *Washington Dehydrated Food Co., supra.*) ■ The method of measuring damages in the present case was therefore proper.

■ We are of the opinion that the evidence is ample to support the findings and the judgment. It appears from the record that a sufficient number of eggs of the quality and character specified to fulfill the contract were always on hand in the possession of the respondent, stored and subject to the appellant's order when desired. They were what were termed "special processed eggs," all of which were candled before they were packed and shipped to the purchaser. The term "special" was understood by the parties to refer to a selected grade of pullet's eggs. They were not purchased as fresh eggs, but the contract called only for "processed eggs." There is no controversy as to whether they were properly processed. This term, as it is used in the poultry industry, merely means that the egg is dipped, or the shell glazed with a solution which is intended to fill the pores of the shell to prevent the penetration of air or bacteria and to thereby deter fermentation or deterioration. (9 American Ency. 727.) Manifestly, the effect of processing eggs will not indefinitely preserve their wholesomeness. It is argued by appellant that the system of candling eggs is inadequate to determine their soundness. But the system of candling eggs is the universal modern method employed by poultrymen to ascertain the quality and condition of eggs. We are referred to no other or better means of determining the age or condition of an egg. Webster's New International Dictionary, at page 319, defines the term "candling" as follows: "To test or examine

by holding (the egg) between the eye and a candle, or other light. Eggs of unknown age are so tested, those unclouded and almost translucent being classed as candled eggs, and next in grade to fresh-laid eggs.'' (*King* v. *C. C. Bendell Commission Co.*, 7 Colo. App. 507 [44 Pac. 377].)

Appellant contends that findings numbered 7, 8, 11, 12, 13, and 14 are unsupported by the evidence. The first three of these findings are general, specifying the terms of the contract entered into between the parties, the readiness and ability of the respondent to fulfill the agreement on its part, and the refusal to comply therewith on the part of appellant; the decrease of the market value of eggs subsequent to the execution of the contract; respondent's sale of the 622 cases of eggs which appellant refused to accept, and the amount of damages sustained by the breach of the contract. There is substantial evidence to support each of these findings. The contract appears in the correspondence heretofore quoted, and the terms are practically undisputed. From a fair reading of the record, it appears that respondent always held in store in its warehouse sufficient ''special processed eggs,'' candled, sound and merchantable, which it was able and willing to ship to appellant upon request. In behalf of respondent, Mr. Whitmore testified: ''We had 750 cases contracted for by the Weed Lumber Company. The orders we got were set aside against the Weed Lumber Company, not as our open stock.'' Mr. Moncharsh testified: ''We set away every case of eggs that we have sold on this contract. Q. At the time that this contract was repudiated in December, 1923, was the balance of the eggs then due on the contract set aside for the Weed Lumber Company? A. They were still in the warehouse waiting to be withdrawn on order.'' Respecting the soundness and quality of the eggs, this last-mentioned witness further testified: ''When we received an order from Weed Lumber Company, we candled every egg to see whether there were any bad ones. Q. And suppose you did find half a dozen cases of bad ones, what would you do with them? A. Throw them away; that would be the loss of Nye & Nisson.'' Mr. Roberts testified: ''. . . Every egg must be candled before it goes out to the customer, so it will be good. We know that it is good if it is candled. . . . I filled orders for Weed Mercantile Company for processed eggs. I can-

dled practically all of them. The condition of the eggs at the time they were shipped under this contract, . . . I would consider very fancy. That is, what we call a fancy egg, is an egg that will keep up anywhere. . . . I never mixed the eggs up. As far as I know there was nothing shipped to Weed Mercantile Company that did not conform to the word 'processed specials.' Q. You say you candled all these eggs? A. The only one that ever helped me was Mr. Whitmore. At times he would candle four or five cases." Respecting the quality of the rejected eggs, which were sold on the open market, Mr. Smith, who purchased 250 cases of these eggs for Fred L. Hilmer Co., testified: "They were processed storage eggs fit for human consumption. There are always a few cracked or bloody eggs that are unfit. . . . These eggs were sample average." There is some controversy over the question as to whether appellant received "Special processed eggs" as the contract required, or another grade of eggs termed "processed pullet eggs." Mr. Moncharsh, however, testified that both of these terms referred to precisely the same grade of eggs. He said: "We use the word 'special,' 'processed special,' in a wholesale way to a jobber; we use the word 'processed pullets' which were the same egg—simply changed to 'specials' in a retail way. . . . We put up eggs other than pullets last year, and called them extras."

It is true, as contended by the appellant, that findings numbers 13 and 14 contain negative pregnant statements, which in form are defective, and leave the inference that while it is found that respondent did not ship 20 cases of eggs to appellant which were mixed in quality and grade, and containing a large quantity of eggs which were old, stale, and decayed, that these cases might have contained a number of bad eggs, although not necessarily a "large quantity" thereof. This is followed by finding number 14, which states in part: "It is not true that *any* shipment of eggs was not of the kind and quality contemplated in the contract entered into between the plaintiff and the defendant. . . . " Finding number 12 contains the following statement: "Plaintiff was at all times herein mentioned, ready and willing to carry out, on its part, the terms and provisions embodied in said contract . . ." and that, "at all times subsequent to the 14th day of December, 1923, (de-

fendant) refused to accept any further delivery of processed eggs as agreed upon in said contract, and refused to live up to the terms and conditions of said contract on its part." The 15th finding is to the effect that all of the allegations of the answer in conflict with the findings of the court are untrue.

The chief issue in the present case is whether the respondent was able to furnish the appellant with sound and merchantable eggs pursuant to the contract. The implied warranty that the eggs were sound and merchantable became a part of the contract by the provisions of sections 1771 and 1775 of the Civil Code, as completely as though that warranty had been incorporated therein. (22 Cal. Jur. 992, sec. 66.) The probative fact to be determined by the court therefore was the question as to whether the undelivered eggs were sound and merchantable. The specific findings that "Plaintiff was at all times . . . ready and willing to carry out . . . the terms and provisions embodied in the contract," and that "It is not true that *any* shipment of eggs was not of the kind and quality contemplated in the contract," necessarily implies that all shipments of eggs complied with the contract, and that, except for a minimum number, they were all sound and merchantable. The mere fact that the court inadvertently found, by the adoption of a negative pregnant, that some of the eggs which had been supplied were "old, stale and decayed," will not require a reversal of the case for the reason that every presumption of the law favors a liberal construction of the findings so as to uphold the judgment rather than to defeat it. (2 Cal. Jur. 871, sec. 511.) Following these well-established rules of law, it must be assumed that merely a minimum number of eggs were defective. There is a recognized distinction between the trade terms of "fresh eggs" and "processed eggs." It is a well-known fact that processed eggs are not presumed to have the high degree of quality possessed by fresh eggs. When a warranty is made as to a recognized grade of a commodity, it must be accepted in the light of the meaning of that term as it is known to the trade. It cannot reasonably be said that there is a breach of warranty as to the quality of processed eggs, merely because a case may contain a defective egg or two. ▮ To permit the cancellation of a contract for 750

cases of processed eggs merely because a minimum number thereof arrived at their destination unfit for use would violate the spirit of the legal maximum *de minimis non curat lex*. A technical defect in the form of the findings will not suffice to reverse a cause. Particularly is this true since the enactment of section 4½ of article VI of the constitution. In spite of the negative pregnant contained in the findings, we are of the opinion that they sufficiently support the judgment, and that the judgment is sustained by the evidence.

 After a partial performance and acceptance of a large number of eggs, the appellant is estopped from canceling his contract, in the absence of evidence that future shipments are likely to be in the same defective condition. Appellant had accepted and paid for 128 cases of eggs from an entire contract for 750 cases before he undertook to cancel his contract. The record is devoid of evidence showing that the undelivered 622 cases of eggs were in quality below the standard of processed eggs. Unless there is evidence that an entire order for a large number of eggs, to be shipped in installments as required over a long period of time, is of the same pack, character, and quality, the fact that shipments received contain a minimum of defective eggs will not warrant the conclusion that future shipments will also contain like defective eggs. In the absence of evidence as to the condition of future shipments of undelivered eggs, one may not accept and pay for a considerable portion of the commodity, and then cancel the contract because of the presence of a small percentage of defective eggs among those which have been accepted. The case of *Baer Grocer Co.* v. *Barber Milling Co.*, 223 Fed. 969, 972 [139 C. C. A. 449], which is in accordance with the weight of authority, states the rule applicable to the circumstances of the present case. In that case the defendant contracted for 5,000 barrels of "White Satin Flour" to be delivered as called for by him. Shipments aggregating 1,650 barrels were made between September, 1910, and the following March. As in the present case, there had been a sharp slump in the market value of flour. The defendant then declined to accept further shipments on the ground that the flour did not comply with the contract. The court said: "The defendant, after thus ordering the flour under

its contract, and continuously for some months receiving the same thereunder, ought not in good faith and fair dealing, having partly performed the contract, to be permitted to rescind the same at its option, because of the alleged defect in the quality of some of the flour furnished. Its remedy, if any, under such circumstances, would be by way of offset or recoupment from the purchase money, or a suit for damages for breach of the contract." (*Guernsey* v. *West Coast Lumber Co.*, 87 Cal. 249 [25 Pac. 414]; *Scott* v. *Kittanning Coal Co.*, 89 Pa. St. 231 [33 Am. Rep. 753]; *Cahen* v. *Platt et al.*, 60 N. Y. 348 [25 Am. Rep. 203]; *Clark* v. *Wheeling Steel Works*, 53 Fed. 494 [3 C. C. A. 600]; 2 A. L. R. 663, note; 29 A. L. R. 1517, note.) In opposition to the foregoing general rule of law, appellant relies on the cases of *Coburn* v. *California etc. Co.*, 144 Cal. 81, 86 [77 Pac. 771], and *Bobrick Chem. Co.* v. *Prest-O-Lite Co.*, 160 Cal. 209 [116 Pac. 747]. Neither of these cases conflicts with the foregoing rule. In the Coburn case, *supra,* the plaintiff contracted to purchase clay which was "suitable for the manufacture of cement." For a period of time he accepted shipments of clay, and attempted to use it by mixing it with clay of another quality, which was procured elsewhere. But the undelivered clay which was contracted for came from the same pit, and was of the same defective quality as that which had been delivered. None of the clay from defendant's pit was suitable for the manufacture of cement. Defendant was therefore utterly unable to comply with his contract. It was therefore properly held that in spite of an acceptance of a quantity of this clay, the plaintiff was entitled to rescind his contract. In the Bobrick Chemical Company case, *supra,* the defendant contracted to purchase a device guaranteed to properly inflate tires, which he agreed to sell as an agent for a period of three years. After accepting and paying for a considerable number of these contrivances, the defendant discovered that they were inherently defective and would not perform the service for which they were purchased. The undelivered devices were as inherently defective and useless as those which had been accepted. Moreover, it appeared that while the plaintiff had received some complaints as to their deficiency, he did not know until after his acceptance of a

number of the devices how utterly unsatisfactory and useless they really were.

There is a clear distinction between the acceptance and partial performance of a contract for a commodity containing only a minimum percentage of defective articles when no such defect is shown to exist in the undelivered portion and a contract for a device or commodity which is inherently and wholly defective and useless for the purpose for which it is purchased.

For the foregoing reasons the judgment is affirmed.

Koford, P. J., and Nourse, J., concurred.