[Civ. No. 1843. Fourth Appellate District.—May 14, 1938.]

JAMES M. O'HARE et al., Respondents, v. PEACOCK DAIRIES, INC. (a Corporation), Appellant.

Harvey, Johnston & Baker for Appellant.

Joseph Scott and Claflin & Dorsey for Respondents.

MARKS, J.—This is an action for damages for breach of contract for the sale of milk. Plaintiffs had judgment and defendant has appealed.

Plaintiffs were dairymen in Kern County. They produced milk which they sold to defendant, a distributor of milk and milk products, under a written contract between defendant's predecessor and plaintiffs. The contract was dated March 26, 1929, and had been executed by the Kern County Creameries & Farm Company, defendant's predecessor, party of the first part, and plaintiffs, parties of the second part. Defendant assumed all the obligations of the contract which had rested upon its predecessor.

The provisions of the contract pertinent to this appeal are as follows:

"That said first party covenants and agrees to purchase of and from second parties, their successors and assigns, and said second parties for their successors and assigns, agree to sell to first party all milk produced upon and from dairy ranches of second parties, at a rate per pound butter fat twenty-five cents (25c) in excess of Los Angeles, butter quotations, the purchase price however to be not less than seventy cents (70c) per pound butter fat irrespective of Los Angeles quotations; . . .

"It is further mutually agreed that this contract shall remain in force for a period of ten years and that the milk agreed to be purchased and sold pursuant to the conditions hereof, shall be all the milk so produced from and upon said ranches, for a period of ten years from and after the date hereof; . . .

"It is expressly provided, however, and one of the conditions of this agreement, that the whole of said milk shall be produced from tuberculin tested cows under grade A inspection, except that no penalty shall be imposed for an occasional high bacteria count."

Defendant maintains the evidence conclusively established that plaintiffs continually breached their contract by producing inferior milk, at times so poor that it was unfit for human consumption; that defendant was justified in refusing to accept such milk and therefore is not liable for any damages as plaintiffs were continually in default and not in a position to perform under the terms of the contract.

As a second ground for reversal defendant maintains that the evidence fails to support the findings and judgment as to the amount of damages awarded plaintiffs. In Civil No. 1842 plaintiffs have appealed from that portion of the judgment which fixed their damages at $10,158.24. Their appeal is supported by a separate record. However, as it is maintained in the appeal in this case that the amount of damages awarded is contrary to the evidence and is not supported by any evidence, and as the question of damages is squarely before us here, we will consider it in this opinion. In order to avoid repetition in the opinion in Civil No. 1842 we will, in this opinion, consider the arguments made and the authorities cited in both appeals.

Defendant's brief contains a rather clear summary of the facts upon which it relies for a reversal on this appeal. That summary is as follows:

"At or before the time when the contract was made plaintiffs were not only producing milk on their dairy ranch, but were also engaged in distributing market milk in the Bakersfield community of Kern County. By market milk is meant principally grade 'A' raw milk, although plaintiffs owned some pasteurizing equipment and also distributed some pasteurized milk. Defendant purchased the entire milk distributing business, equipment and good will from plaintiffs and commenced purchasing the milk by plaintiffs produced on their ranch, and actually received plaintiffs' milk and paid contract price therefor from March 26, 1929, until noon of June 24, 1933, when further deliveries were completely and finally refused by defendant in conformity to written notice to such effect then served by defendant on plaintiffs.

"March 12, 1932, State Dairy Inspector Lucas on behalf of Kern County Health Department officially degraded plaintiffs' dairy and barred plaintiffs' milk from market in Kern County for grade 'A' milk purposes. Plaintiffs never effected a raising of this ban which continued to, and was in effect on, noon of June 24, 1933, and thereafter so that defendant, from and after March 12, 1932, was officially denied the local county market contemplated by the parties when the contract was entered into and the Bakersfield milk distributing business and equipment was purchased of plaintiffs by defendant. October 24, 1932, State Dairy Inspector Holt on behalf of the Pasadena Health Department officially barred plaintiffs' milk from Pasadena for any purpose. . . . Between October 24, 1932, and June 24, 1933, plaintiffs' milk was marketed for cream purposes through defendant in Los Angeles. During this period State Dairy Inspectors White and Ladd were in charge of the Kern County area and adjoining areas for the Los Angeles Health Department, Inspector White being stationed at Tulare in general charge of the technical laboratory there as well as the field work. Inspector Ladd did the field work for that Department in Kern County during this period. At trial the Court restricted the evidence as to condition of plaintiffs' dairy to the period following January 1, 1933. It appears that Inspector Ladd carefully and in detail inspected plaintiffs' dairy several times between January 1, 1933, and June 24, 1933. The evidence is to the effect that on June 23, 1933, and at other times the dairy was not a grade 'A' dairy, that the milk was

not grade 'A'; and that streptococci infection in dangerous amounts was present on one occasion when a definite test was made; and that on June 23, 1933, he excluded the dairy officially for grade 'A' purposes; that this ban continued to June 28, 1933; that on June 28, 1933, the dairy was restored to a grade 'A' cream basis for the Los Angeles market.

"In addition to testimony of official inspectors as to the basic conditions of plaintiffs' dairy which occasioned the exclusion orders above mentioned, considerable evidence was received from witnesses who were not State Dairy Inspectors, and who were not entitled to qualify the milk 'under grade A inspection' as provided by the contract. In this connection it appeared that the milk sold defendant by plaintiffs during all the time Martin Pedersen was plant manager, commencing March 1, 1931, was never used by defendant for grade 'A' raw milk purposes contemplated by the contracting parties and that after the Pasadena shutoff in October, 1932, the milk was used only for manufacturing purposes even though the value of milk for pasteurizing was materially less than for raw milk, and the value of milk for manufacturing was materially less than for pasteurizing.

"On the evening of June 22, 1933, after receipt of the official order of Inspector Ladd, defendant notified plaintiffs that no further milk would be accepted from their dairies, because plaintiffs had failed to supply defendant with grade 'A' milk in accordance with the terms of the contract, and no milk was thereafter received by defendant from plaintiffs' dairy under the contract.

"Plaintiffs continued operation of their dairy until December 1, 1935, when they disposed of their herd and discontinued production."

The foregoing facts are taken largely from the testimony of defendant's witnesses and is the evidence most favorable to defendant. In making this summary counsel for defendant overlook the time-honored rules that on appeal evidence most favorable to the prevailing party must be taken as true and all conflicts disregarded.

Plaintiffs' evidence may be summarized as follows: That they regularly employed a qualified veterinarian who inspected the cattle at least twice each month; that the cows were in excellent health and in good condition; that they were given the tuberculin test once each year and that the

herd was free from infection; that a bacteria count of the milk was taken about once each month by a qualified bacteriologist in the employ of the county of Kern; that the counts showed the milk to be excellent; that the milk house, barns, equipment and premises were kept clean and sanitary; that the cows were washed regularly; that much of the equipment used was either purchased through defendant or was recommended by its officers; that every improvement in the premises or equipment recommended by dairy inspectors or the officers of defendant was promptly made; that the dairy was entitled to a rating that would permit it to sell grade A raw milk; that the milk was excellent; that after defendant refused to further accept plaintiffs' milk it was sold to other distributors under the classification of grade A and was so classified and paid for until plaintiffs sold their herd on December 1, 1935.

A dairy inspector testified that he inspected the dairy on June 22, 1933, and found conditions deplorable; that he found a used strainer cloth which was foul with offal, dirt and other filth and had on it garget caused from mastitis indicating a diseased condition of the mammary gland which causes the production of impure milk not fit for consumption in its raw state. Other witnesses testified to the presence of garget in the milk, its high bacteria count and general unfitness for classification as grade A milk.

Plaintiffs produced witnesses who flatly contradicted this evidence in all particulars or made thorough explanation of it. One witness testified that the strainer cloth picked up by the dairy inspector had been used and thrown into the drain to be washed away with other refuse and that this accounted for its foul condition. This witness further testified that the so-called garget on this cloth was not garget but particles of butter fat. The bad condition in which the milk reached the creamery on occasion was explained by calling attention to section 18 of the General Dairy Law of California (Stats. 1923, p. 849) in effect at the time in question here and which contained the following provision:

"All empty cans, bottles, vessels or other containers delivered to the producer by the manufacturer, retailer, or distributor for the reception of milk or any product of milk shall be kept by said producer in a clean, sanitary, sterile

condition and shall be used for no other purpose whatsoever.''

This witness also testified that the containers delivered by defendant to plaintiffs in which to transport the milk were not clean and sterile and that this condition caused the deterioration of the milk en route to the creamery; that on several occasions plaintiffs complained of this condition to defendant's officers without effect.

Another witness for plaintiffs explained the exclusion, from Los Angeles, of the milk from plaintiffs' dairy by saying that it was a part of a quarantine against all milk produced in Kern County and was not particularly directed at plaintiffs; that this quarantine had been established because of the condition of some of the dairies of Kern County.

We have gone into considerable detail in outlining the evidence in order to show the irreconcilable conflicts in it. If defendant's evidence be accepted as true, it was not only justified in refusing to continue to accept plaintiffs' milk but displayed great patience and forbearance in receiving it as long as it did. If the condition of the dairy, the cows and the milk was as bad as described, defendant's due regard for the health and welfare of its customers might be open to question from the fact that it accepted the milk at all. On the other hand, if plaintiffs' evidence be believed, the dairy was sanitary and in excellent condition, the herd healthy and the dairy of such classification that its milk should have been sold as grade A raw.

The trial judge accepted plaintiffs' evidence as true. All conflicts in the evidence are addressed to and are to be resolved by him. He found that plaintiffs had performed in accordance with the terms of the contract and were able to perform up to December 1, 1935, when they sold their herd and went out of the dairy business. We cannot disturb a finding or reverse a judgment merely because of conflicts in the evidence.

Defendant seeks to escape the result of these rules by urging that the clause in the contract reading, ''that the whole of said milk shall be produced from tuberculin tested cows under grade A inspection'', means that the inspection must be made by state dairy inspectors who must find conditions justifying the production and sale of grade A raw milk; that no evidence other than that of such inspectors could be

received to show the condition of the dairy, herd and milk; that in the absence of proof of fraud on the part of the state inspector, his action in degrading the dairy was final and conclusive and of itself established a breach of contract on the part of plaintiffs sufficient to justify defendant's refusal to continue to accept milk; that the trial court could accept no testimony of any witness other than that of another state dairy inspector in contradiction of the evidence of the inspector who degraded the dairy.

■ Defendant's contention that the contract provides for the production and sale of only grade A *raw* milk cannot be sustained. The contract does not so provide. Subdivision "a" of section 3 of the Pure Milk Law of California (Stats. 1927, p. 1944) established the grades of market milk in California among which is "grade A milk". Subdivision "d" of the same section defined grade A milk as both grade A *raw* and grade A *pasteurized*. At the time of the execution of the contract here in question the term "grade A milk" had a fixed statutory definition. When that term was used in the contract it must be held to have been used in the sense in which it was defined in the statute. As the statutory definition was clear, the contract contained no ambiguity that could be explained by parol. Therefore, as the contract did not provide that the milk produced must be subjected to classification as grade A *raw* we must reject the contention that the word *raw* should be read into it.

We must next turn to defendant's contention that the phrase "grade A inspection" must be construed to mean a grade A rating made by a state dairy inspector after he had made an inspection, and that no evidence other than that of a state inspector could be received to establish the grade of the milk produced at plaintiffs' dairy.

We need pay little attention to the evidence produced by defendant concerning the condition of the dairy prior to the inspection by the state dairy inspector on June 22, 1933, upon which defendant acted in the termination of the contract. ■ If there were breaches of the contract by plaintiffs prior to that date those breaches were waived by defendant by its continuing to accept and pay for plaintiffs' milk at contract prices. (*Boyles* v. *Kingsbaker*, 5 Cal. (2d) 68 [53 Pac. (2d) 141].) If evidence of prior breaches has any value at all its force must be limited to corroboration of the

evidence of the state inspector as to the conditions he found on June 22, 1933.

As we have seen, the term "grade A" as used in reference to milk has its meaning defined by statute and includes both "grade A raw" and "grade A pasteurized" milk. It is a classification of milk based upon its excellence and the condition of the dairy.

The terms "inspect" and "inspection" are in common use and have well defined and generally understood meanings. In *United States* v. *A. Bentley & Sons Co.*, 293 Fed. 229, at 240, it is said:

" 'To inspect' means to look; to view or oversee for the purpose of examination; to look into; to view and examine for the purpose of ascertaining the quality or condition of the thing; to view and examine for the purpose of discovering and correcting errors. (*People* v. *General Committee*, 25 App. Div. 339 [49 N. Y. Supp. 723, 728]; *Pabst Brewing Co.* v. *Crenshaw*, 198 U. S. 17, 33 [25 Sup. Ct. 552, 49 L. Ed. 925]."

In *Fidelity & Casualty Co.* v. *City of Seattle*, 16 Wash. 445 [47 Pac. 963], it was said:

"Inspection is not necessarily confined to optical observation, but is ordinarily understood to embrace tests and examinations. The definition cited from Webster by the appellant, namely, 'to look upon; to examine for the purpose of determining quality, and detecting what is wrong, and the like', seems to us sufficient to show the failure of the contention, and we think the ordinarily accepted meaning of the word 'inspection' is fully as broad and comprehensive as the definition given by the lexicographer above." To the same effect are *Silfies* v. *Austin*, 104 Pa. Super. 344 [158 Atl. 661]; *Sim* v. *State*, 142 Misc. 159 [254 N. Y. Supp. 150]; *Texas & P. Ry. Co.* v. *Allen*, 114 Fed. 177.

We are of the conclusion that the phrase "grade A inspection" was used in the contract to establish the standard or grade of milk to be delivered by plaintiffs to defendant and that this standard or grade might be proved by the evidence of a state inspector or that of any other qualified person. The contract does not require that the inspection be made exclusively by a state inspector, and in the absence of such provision it should follow that the quality of the milk and condition of the dairy might be proved by the testimony of

any competent person. Further, defendant admits that proof of fraud on the part of a state dairy inspector in degrading a dairy would furnish reasons for a trial judge rejecting his evidence and listening to the testimony of other witnesses. This query arises, in view of the violent conflict in the evidence,—the testimony of the inspectors as to the deplorable conditions at the dairy and the testimony of others as to the excellent conditions there,—is there not some evidence of fraud in the record? Fraud is seldom proved by direct affirmative testimony. Usually it must be established by circumstantial evidence.

If we are in error in what we have just said, there is another controlling reason why we must approve the action of the trial court in accepting the testimony of witnesses other than state dairy inspectors as to the rating to which the dairy was entitled. If, as we have held, the word "inspection", as used in the contract, may be defined in its usual sense, and if, as defendant maintains, it can also be defined as meaning inspection by state dairy inspectors only, then there is an ambiguity in the contract that is subject to explanation and construction. It is well settled that where such an ambiguity exists in a contract, the question of its proper construction is first addressed to the trial judge, and if the conclusion reached by him is not unreasonable it will be supported on appeal. The trial judge having construed the contract in a sense favorable to plaintiffs, and as that construction is not unreasonable, we must accept it here.

As the trial court found on sharply conflicting evidence that plaintiffs had performed under their contract, and that defendant had wrongfully refused to accept their milk, it follows that plaintiffs are entitled to recover proper damages. (*Wood, Curtis & Co.* v. *Seurich*, 5 Cal. App. 252 [90 Pac. 51]; *California Sugar & White Pine Agency* v. *Penoyar*, 167 Cal. 274 [139 Pac. 671].)

This brings us to the question of the evidence of damage, the proper measure of damage, and whether plaintiffs can recover damages after December 1, 1935, when they sold their herd, to March 26, 1939, the end of the ten-year term.

Counsel for both parties argue that the amount of the damages awarded in the sum of $10,158.24 is not supported by the evidence and is contrary to the evidence. The trial judge took the view that the proper measure of damage to be

awarded was the difference between the cost of production and the minimum contractual selling price of seventy cents per pound of butter fat in the milk delivered. He fixed the cost of production at fifty-four cents per pound of butter fat and arrived at the amount of damages by multiplying by sixteen cents the total number of pounds of butter fat produced by plaintiffs between the date of default and December 1, 1935, which he fixed at 63,489 pounds.

Counsel for defendant complain that the trial judge did not include in his estimate of the costs of production the value of the services of plaintiffs who devoted part, if not all, of their time to the dairy; the value of feed raised by plaintiffs on their own and another farm which was fed to the herd; rental value of the farm on which the herd was kept; interest on capital investment; other items not necessary to segregate. A study of the record leads us to the conclusion that some part, if not all, of these contentions are correct.

Plaintiffs contend that the evidence shows that they produced and could have delivered over 70,000 pounds of butter fat instead of the 63,489 pounds as found by the trial court. They also produced several tables in each of which they used a separate basis of figuring production costs and in none of them is the result reached of the cost of fifty-four cents per pound of butter fat. We are inclined to agree with plaintiffs on some of these contentions.

It follows that the award of damages in the sum of $10,-158.24 cannot be sustained. However, from the view we take of the case and of the rule governing the proper measure of damage to be applied here, we need spend no further time on these arguments of the parties.

The question of the proper rule of the measure of damage to be applied here presents some difficulties. Counsel agree on the rules of law governing the damages recoverable for breach, by the buyer, of a contract of sale of personal property, but cannot agree on the particular rule to be applied to the facts before us. It is admitted that where a contract for the sale of personal property not in being is breached by the buyer, the measure of damage is the difference between the cost of production and the contract price. It is also agreed that where a contract for the sale of personal property in the possession of the seller, title not having passed, is breached by the buyer, the seller may resell the property

and recover the difference between the market price at the time of the sale and the contract price. (Sec. 1784, Civ. Code; *Sobelman* v. *Maier*, 203 Cal. 1 [262 Pac. 1087]; *Nye & Nisson* v. *Weed Lumber Co.*, 92 Cal. App. 598 [268 Pac. 659]; *Central Oil Co.* v. *Southern Refining Co.*, 154 Cal. 165 [97 Pac. 177].)

Defendant urges that the milk was not in being at the time of the breach of the contract; that it was not then in the possession of plaintiffs, the sellers; that it was produced daily thereafter; that therefore if plaintiffs can recover at all they can only recover the difference between the cost of production and the contract price. Plaintiffs reply that they were in possession of the cows that produced the milk; that the daily process of production was an automatic phenomenon of nature over which they had no control and with which they could not interfere; that the milk had a potential existence at the time of the breach; that the possession of the cows should be construed to be possession of the milk which they would produce in the future during the life of the contract. Both arguments are strongly presented and a choice between them is not a simple matter. We have been cited to no California case with parallel facts.

It is true that plaintiffs' cows were in their possession at the time of the breach of the contract by defendant. It is also true that those cows automatically produced milk daily and that plaintiffs could not stop its production unless they destroyed their herd. This they were under no obligation to do.

In 23 Ruling Case Law, pages 1243-1245, we find the following:

"A transmutation of title to the property sold is an essential element of a sale, as distinguished from an executory contract of sale, and therefore in order to make a complete sale of property whereby the title would pass from the seller to the buyer, it is necessary that the thing which is the subject of the sale should have an actual or potential existence at the date of the sale. On the other hand property may be the subject of a sale if it has a potential or possible existence, as the product or increase of that which is in existence, and the right to it when it shall come into existence is a present vested right. In such case, the sale is absolute and perfect when made, vesting the property in the purchaser the moment

it comes into existence. In all such cases, the thing sold has a potential existence, and the hopes or expectations of means founded on a right *in esse* is the object of sale. . . . Things have a potential existence which are' the natural product or the expected increase of something already belonging to the seller. . . . Likewise milk and butter, the expected products of a dairy to be produced in future from cows then in the hands of the seller, have such a potential existence that they may be lawfully sold, and the sale will vest the products in the purchaser the moment they come into existence.''

In *Arques* v. *Wasson,* 51 Cal. 620 [21 Am. Rep. 718], by way of *dicta,* it was said:

''It is conceded by counsel that if the thing has a potential existence, as, for example, wool to be grown from sheep then belonging to the mortgagor, or butter to be thereafter produced from his cows, or a crop arising from seed already sown, the mortgage would be valid. The general rule undoubtedly is that a person cannot convey a thing not *in esse,* or in which he has no present interest. But it is quite as well settled, that if the thing has a potential existence it may be mortgaged or hypothecated. 'If one, being a person, give to another all the wool he shall have for tithes the next year, this is a good grant, although none may arise, for the tithes are potentially in the person. . . . So one may grant all the wool of his sheep for seven years; but not of the sheep which he shall thereafter purchase.' (*Van Hoozer* v. *Corey,* 34 Barb. (N. Y.) 12, and authorities there cited.) ''

The case of *Cutting Packing Co.* v. *Packers Exchange of California,* 86 Cal. 574 [25 Pac. 52, 21 Am. St. Rep. 63, 10 L. R. A. 369], by analogy, is strong authority supporting the position of plaintiffs. In that case Wm. C. Blackwood sold to the Cutting Packing Company the crops of apricots to be grown on his trees during the five years following 1881. The purchaser assigned its contract to The Packers' Exchange of California which without cause defaulted on its contract and refused to accept the fruit. The Cutting Packing Company took the fruit for which it paid the contract price. It resold the fruit on the open market at a loss and sued The Packers' Exchange of California for the difference between the contract price and the selling price. In affirming the judgment for the Cutting Packing Company the Supreme Court said:

"It is clear that a breach of the implied contract thus created between the parties here was made when the defendant refused to accept and pay for the crop of 1884; and the plaintiff, upon the breach being so made, having stepped in and received and paid for the crop pursuant to the original contract, as it was obliged to do, thereby acquired the right to recover, as damages, from the defendant, the difference between the price paid under the contract to Blackwood, and that realized from the sale of the fruit in open market at current rates."

In the case of *Central Oil Co.* v. *Southern Refining Co., supra,* the plaintiff sold to defendant a minimum number of barrels of oil which were to be produced from its well. The defendant wrongfully breached the contract and plaintiff resold the oil at the market price and recovered judgment for the difference between the market price and the contract price. The Supreme Court held this to be the proper measure of damages. (See, also, *Nye & Nisson* v. *Weed Lumber Co., supra; Miller* v. *Robertson,* 266 U. S. 243 [45 Sup. Ct. 73, 69 L. Ed. 265].) The decision in the Central Oil Company case becomes more persuasive when we remember that when the contract was made the oil was not personal but real property, for oil in place is a part of the fee and only becomes personal property when it is recovered on the surface. (*Stone* v. *City of Los Angeles,* 114 Cal. App. 192 [299 Pac. 838]. See, also, *Callahan* v. *Martin,* 3 Cal. (2d) 110 [43 Pac. (2d) 788, 101 A. L. R. 871].) Therefore, when the contract was made the oil had only a potential existence as personal property, in which form it was sold.

We therefore conclude that the milk from the cows in the possession of plaintiffs at the time of the breach of the contract by defendant had sufficient potential existence to enable plaintiffs to invoke the rule of damages governing breach of a contract for the sale of a product in being and in possession of the seller at the time of the breach, which rule permits the seller to sell the article on the open market and to recover as damages the difference between the contract price and the selling price obtained on the open market. Milk prices were greatly depressed after the contract was executed. This would probably entitle plaintiffs to recover a greater sum than that awarded in the court below.

■ Plaintiffs next contend that the trial court erred in not allowing them prospective damages from the time they sold their herd on December 1, 1935, to the end of the term of the contract on March 26, 1939. This question may be thus stated: Can plaintiffs recover after voluntarily putting it out of their power to perform under the contract? On this question the trial court found:

"That on the day prior to the commencement of the trial of this action plaintiffs ceased producing milk from their dairy ranches and therefore were unable to deliver milk under said contract, and that plaintiffs are not entitled to recover damages under said contract after they ceased producing."

In support of their contention that they should have been awarded prospective damages to the end of the contract period, plaintiffs cite 22 Cal. Jur. 1053, 1054; *Hale* v. *Trout*, 35 Cal. 229, and *Los Angeles Gas & Elec. Co.* v. *Amalgamated Oil Co.*, 156 Cal. 776 [106 Pac. 55].

In 22 California Jurisprudence, at page 1054, we find the following:

"In the case of a contract, which requires periodical deliveries or delivery by instalments—the transaction being single or indivisible—the buyer's breach absolves the seller of any obligation in respect of future deliveries, and hence the buyer cannot defend upon the ground that the seller incapacitated himself to perform in future."

The only case cited in support of the text is *Ahlers* v. *Smiley*, 163 Cal. 200 [124 Pac. 827]. While there may be *dicta* in the opinion supporting the text, the question we are considering was not before the court for decision. It appears on page 204 of the opinion that no damages were awarded the sellers after they had disposed of their plant and thus put it out of their power to perform.

In *Hale* v. *Trout, supra,* the plaintiffs had erected a sawmill for the manufacture of lumber which defendants had agreed to purchase. Defendants wrongfully breached the contract and refused to accept future deliveries of lumber during the balance of the term of the contract. The Supreme Court was of the opinion that plaintiffs were not compelled to continue manufacturing lumber and thus to at all times keep themselves in readiness to perform their obligations under the contract in order to enable them to recover prospective profits

after the breach by defendants. The Hale case differs factually from the instant case in this important particular: in the Hale case the plaintiffs did not dispose of their saw-mill and thereby reduce their capital investment to cash, while in the instant case the dairy was sold by the O'Hare brothers, who presumably received its full market value in cash, which they were then free to use and enjoy in other business ventures or from which interest could have been received. The decision in the Hale case, when compared with the facts of the instant case, goes no farther than holding that the Hale brothers were not required to keep steam in their boilers and a crew of men at their saw-mill engaged in the manufacture of lumber after the buyers had refused to accept deliveries of lumber.

The sole question decided in the Los Angeles Gas & Electric Company case was that the contract for the sale of oil over a period of years was entire and indivisible and not severable. The question we are now considering was not before the court.

It must be admitted that the contract we have before us was entire and indivisible and was not a severable contract. (*Karales* v. *Los Angeles Creamery Co.*, 36 Cal. App. 171 [171 Pac. 821]; *Los Angeles Gas & Elec. Co.* v. *Amalgamated Oil Co., supra.*) It also must be admitted that it is generally held that where the buyer breaches such a contract the seller, not being at fault, may recover damages in such an amount as would compensate him for all the detriment caused by the breach (sec. 3300, Civ. Code); that the seller need not keep himself in a position to perform after the breach; that prospective loss to the end of the term of the contract may be compensated in damages. These rules are applied subject to the rule that the prospective damages be capable of sufficiently accurate computation so as not to violate the rule against uncertain and speculative damages.

In all the cases to which we have been cited in which the rule has been applied that the seller need not keep himself in a position to perform, the seller retained ownership of the means of manufacture or production. In the instant case we have the unusual situation of the sellers disposing of the means of production and changing the form of their capital investment by reducing it to cash. They not only put themselves in a position where they were not able to perform but

received the immediate benefit of the use of their entire capital investment.

We take it that had all of plaintiffs' cattle become suddenly infected with tuberculosis after defendant breached the contract, plaintiffs would have suffered no further damage from the breach. The contract did not require defendant to accept milk from tubercular cows and plaintiffs would have had no milk to sell and consequently could have suffered no further damage from the refusal to accept that which they could not deliver. The situation presented by the sale of the herd does not differ in principle from the situation which we have assumed. After the sale of the herd plaintiffs had no milk to deliver and suffered no prospective damage. They could not buy milk from others to deliver to defendant because the contract only required defendant to buy "all milk produced upon and from the dairy ranches" of plaintiffs. When plaintiffs went out of the dairy business on December 1, 1935, they could suffer no prospective damage because defendant was not compelled by the contract to accept anything which they had for sale.

There should be some analogy between the facts before us and the rule announced in section 460, at page 859, Restatement of the Law, Contracts:

"Where the existence of a specific thing or person is, either by the terms of a bargain or in the contemplation of both parties, necessary for the performance of a promise in the bargain, a duty to perform the promise. . . .

"(b) is discharged if the thing or person subsequently is not in existence in time for seasonable performance, unless a contrary intention is manifested, or the contributing fault of the promisor causes the nonexistence." (See, also, *Williams* v. *Miller,* 68 Cal. 290 [9 Pac. 166] ; *Mineral Park Land Co.* v. *Howard,* 172 Cal. 289 [156 Pac. 458, L. R. A. 1916F, 1].)

In the instant case the defendant did not agree to buy any definite number of gallons of milk, but only the milk produced on plaintiffs' farms. After the sale of the dairy herds there was no milk produced on those farms and there was nothing left that defendant had agreed to buy. Plaintiffs had voluntarily disposed of their dairy herd and had gone out of the milk producing business on December 1, 1935. Defendant was not obligated to accept milk produced elsewhere than on the farms of plaintiffs. Plaintiffs voluntarily

changed their capital investment from cows to money. Apparently they preferred to receive the income from the money rather than to rely on a prospective profit from the cows. They could no longer perform under their contract as they produced no milk for sale. Their prospective damage could not be fixed with any degree of exactness because they had by the sale of their cows removed the only possible basis upon which future damages could be computed.

The judgment is reversed and the cause is remanded for new trial solely on the issue of the amount of damages, with direction to the trial court to retry the issue of the amount of damages only; to amend its findings of fact and conclusions of law in accordance with the evidence so taken and the views herein expressed, and to render judgment in favor of plaintiffs for the amount of damages so found upon a determination of that issue.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 13, 1938, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 11, 1938.