[S. F. No. 14879. In Bank.—July 30, 1934.]

FRANK M. DAVIS et al., Appellants, v. OLIN D. JACOBY et al., as Executors, etc., Respondents.

Walter H. Linforth, Wm. M. Cannon and John L. McVey for Appellants.

Marshall Rutherford, Fitzgerald, Abbott & Beardsley, Calkins, Hagar, Hall & Linforth, Goudge, Robinson & Hughes, Chapman, Trefethen, Richards & Chapman and Cormac & Bolles for Respondents.

THE COURT.—Plaintiffs appeal from a judgment refusing to grant specific performance of an alleged contract to make a will. The facts are not in dispute and are as follows:

The plaintiff Caro M. Davis was the niece of Blanche Whitehead who was married to Rupert Whitehead. Prior to her marriage in 1913 to her coplaintiff Frank M. Davis, Caro lived for a considerable time at the home of the Whiteheads, in Piedmont, California. The Whiteheads were childless and extremely fond of Caro. The record is replete with uncontradicted testimony of the close and loving relationship that existed between Caro and her aunt and uncle. During the period that Caro lived with the Whiteheads she was treated as and often referred to by the Whiteheads as their daughter. In 1913, when Caro was married to Frank Davis the marriage was arranged at the Whitehead home and a reception held there. After the marriage Mr. and Mrs. Davis went to Mr. Davis' home in Canada, where they have resided ever since. During the period 1913 to 1931 Caro made many visits to the Whiteheads, several of them being of long duration. The Whiteheads visited Mr. and Mrs. Davis in Canada on several occasions. After the marriage and continuing down to 1931 the closest and most friendly relationship at all times existed between these two families. They corresponded frequently, the record being replete with letters showing the loving relationship.

By the year 1930 Mrs. Whitehead had become seriously ill. She had suffered several strokes and her mind was failing. Early in 1931 Mr. Whitehead had her removed to a private hospital. The doctors in attendance had informed him that she might die at any time or she might linger for many months. Mr. Whitehead had suffered severe financial reverses. He had had several sieges of sickness and was in poor health. The record shows that during the early part of 1931 he was desperately in need of assistance with his wife, and in his business affairs, and that he did not trust his friends in Piedmont. On March 18, 1931, he wrote to Mrs. Davis telling her of Mrs. Whitehead's condition and added that Mrs. Whitehead was very wistful. "Today I endeavored to find out what she wanted. I finally asked her if she wanted to see you. She burst out crying and we had great difficulty in getting her to stop.

Evidently, that is what is on her mind. It is a very difficult matter to decide. If you come it will mean that you will have to leave again, and then things may be serious. I am going to see the doctor, and get his candid opinion and will then write you again. . . . Since writing the above, I have seen the doctor, and he thinks it will help considerably if you come.'' Shortly thereafter, Mr. Whitehead wrote to Caro Davis further explaining the physical condition of Mrs. Whitehead and himself. On March 24, 1931, Mr. Davis, at the request of his wife, telegraphed to Mr. Whitehead as follows: ''Your letter received. Sorry to hear Blanche not so well. Hope you are feeling better yourself. If you wish Caro· to go to you can arrange for her to leave in about two weeks. Please wire me if you think it advisable for her to go.'' On March 30, 1931, Mr. Whitehead wrote a long letter to Mr. Davis, in which he explained in detail the condition of Mrs. Whitehead's health and also referred to his own health. He pointed out that he had lost a considerable portion of his cash assets but still owned considerable realty, that he needed someone to help him with his wife and some friend he could trust to help him with his business affairs and suggested that perhaps Mr. Davis might come to California. He then pointed out that all his property was community property; that under his will all the property was to go to Mrs. Whitehead; that he believed that under Mrs. Whitehead's will practically everything was to go to Caro. Mr. Whitehead again wrote to Mr. Davis under date of April 9, 1931, pointing out how badly he needed someone he could trust to assist him, and giving it as his belief that if properly handled he could still save about $150,000. He then stated: ''Having you [Mr. Davis] here to depend on and to help . me regain my mind and courage would be· a big thing.'' Three days later, on April 12, 1931, Mr. Whitehead again wrote, addressing his letter to ''Dear Frank and Caro'', and in this letter made the definite offer, which offer it is claimed was accepted and is the basis of this action. In this letter he first pointed out that Blanche, his wife, was in a private hospital and that ''she cannot last much longer . . . my affairs are not as bad as I supposed at first. Cutting everything down I figure 150,000 can be saved from the wreck.'' He then enumerated the values placed upon his various properties and then

continued "my trouble was caused by my friends taking advantage of my illness and my position to skin me

"Now if Frank could come out here and be with me, and look after my affairs, we could easily save the balance I mentioned, provided I dont get into another panic and do some more foolish things.

"The next attack will be my end, I am 65 and my health has been bad for years, so, the Drs. dont give me much longer to live. So if you can come, Caro will inherit everything and you will make our lives happier and see Blanche is provided for to the end

"My eyesight has gone back on me, I cant read only for a few lines at a time. I am at the house alone with Stanley [the chauffeur] who does everything for me and is a fine fellow. Now, what I want is some one who will take charge of my affairs and see I dont lose any more. Frank can do it, if he will and cut out the booze.

"Will you let me hear from you as soon as possible, I know it will be a sacrifice but times are still bad and likely to be, so by settling down you can help me and Blanche and gain in the end. If I had you here my mind would get better and my courage return, and we could work things out."

This letter was received by Mr. Davis at his office in Windsor, Canada, about 9:30 A. M. April 14, 1931. After reading the letter to Mrs. Davis over the telephone, and after getting her belief that they must go to California, Mr. Davis immediately wrote Mr. Whitehead a letter, which, after reading it to his wife, he sent by air mail. This letter was lost, but there is no doubt that it was sent by Davis and received by Whitehead, in fact the trial court expressly so found. Mr. Davis testified in substance as to the contents of this letter. After acknowledging receipt of the letter of April 12, 1931, Mr. Davis unequivocally stated that he and Mrs. Davis accepted the proposition of Mr. Whitehead and both would leave Windsor to go to him on April 25th. This letter of acceptance also contained the information that the reason they could not leave prior to April 25th was that Mr. Davis had to appear in court on April 22d as one of the executors of his mother's estate. The testimony is uncontradicted and ample to support the trial court's finding that this letter was sent

by Davis and received by Whitehead. In fact under date of April 15, 1931, Mr. Whitehead again wrote to Mr. Davis and stated ''Your letter by air mail received this a. m. Now, I am wondering if I have put you to unnecessary trouble and expense, if you are making any money dont leave it, as things are bad here. . . . You know your business and I dont and I am half crazy in the bargain, but I dont want to hurt you or Caro

''Then on the other hand if I could get some one to trust and keep me straight I can save a good deal, about what I told you in my former letter.''

This letter was received by Mr. Davis on April 17, 1931, and the same day Mr. Davis telegraphed to Mr. Whitehead ''Cheer up—we will soon be there, we will wire you from the train.''

Between April 14, 1931, the date the letter of acceptance was sent by Mr. Davis, and April 22d, Mr. Davis was engaged in closing out his business affairs, and Mrs. Davis in closing up their home and in making other arrangements to leave. On April 22, 1931, Mr. Whitehead committed suicide. Mr. and Mrs. Davis were immediately notified and they at once came to California. From almost the moment of her arrival Mrs. Davis devoted herself to the care and comfort of her aunt, and gave her aunt constant attention and care until Mrs. Whitehead's death on May 30, 1931. On this point the trial court found: ''from the time of their arrival in Piedmont, Caro M. Davis administered in every way to the comforts of Blanche Whitehead and saw that she was cared for and provided for down to the time of the death of Blanche Whitehead on May 30, 1931; during said time Caro M. Davis nursed Blanche Whitehead, cared for her and administered to her wants as a natural daughter would have done toward and for her mother''.

This finding is supported by uncontradicted evidence and in fact is conceded by respondents to be correct. In fact the record shows that after their arrival in California Mr. and Mrs. Davis fully performed their side of the agreement.

After the death of Mrs. Whitehead, for the first time it was discovered that the information contained in Mr. Whitehead's letter of March 30, 1931, in reference to the contents of his and Mrs. Whitehead's wills was incorrect. By a duly witnessed will dated February 28, 1931, Mr. White-

head, after making several specific bequests, had bequeathed all of the balance of his estate to his wife for life, and upon her death to respondents Geoff Doubble and Rupert Ross Whitehead, his nephews. Neither appellant was mentioned in his will. It was also discovered that Mrs. Whitehead by a will dated December 17, 1927, had devised all of her estate to her husband. The evidence is clear and uncontradicted that the relationship existing between Whitehead and his two nephews, respondents herein, was not nearly as close and confidential as that existing between Whitehead and appellants.

After the discovery of the manner in which the property had been devised was made, this action was commenced upon the theory that Rupert Whitehead had assumed a contractual obligation to make a will whereby ''Caro Davis would inherit everything''; that he had failed to do so; that plaintiffs had fully performed their part of the contract; that damages being insufficient, *quasi* specific performance should be granted in order to remedy the alleged wrong, upon the equitable principle that equity regards that done which ought to have been done. The requested relief is that the beneficiaries under the will of Rupert Whitehead, respondents herein, be declared to be involuntary trustees for plaintiffs of Whitehead's estate.

It should also be added that the evidence shows that as a result of Frank Davis leaving his business in Canada he forfeited not only all insurance business he might have written if he had remained, but also forfeited all renewal commissions earned on past business. According to his testimony this loss was over $8,000.

The trial court found that the relationship between Mr. and Mrs. Davis and the Whiteheads was substantially as above recounted and that the other facts above stated were true; that prior to April 12, 1931, Rupert Whitehead had suffered business reverses and was depressed in mind and ill in body; that his wife was very ill; that because of his mental condition he ''was unable to properly care for or look after his property or affairs''; that on April 12, 1931, Rupert Whitehead in writing made an offer to plaintiffs that, if within a reasonable time thereafter plaintiffs would leave and abandon their said home in Windsor, and if Frank M. Davis would abandon or dispose of his said

business, and if both the plaintiffs would come to Piedmont in the said county of Alameda where Rupert Whitehead then resided and thereafter reside at said place and be with or near him, and, if Frank M. Davis would thereupon and thereafter look after the business and affairs of said Rupert Whitehead until his condition improved to such an extent as to permit him so to do, and if the plaintiffs would look after and administer to the comforts of Blanche Whitehead and see that she was properly cared for until the time of her death, that, in consideration thereof, Caro M. Davis would inherit everything that Rupert Whitehead possessed at the time of his death and that by last will and testament Rupert Whitehead would devise and bequeath to Caro M. Davis all property and estate owned by him at the time of his death, other than the property constituting the community interest of Blanche Whitehead; that shortly prior to April 12, 1931, Rupert Whitehead informed plaintiffs of the supposed terms of his will and the will of Mrs. Whitehead. The court then finds that the offer of April 12th was not accepted. As already stated, the court found that plaintiffs sent a letter to Rupert Whitehead on April 14th purporting to accept the offer of April 12th, and also found that this letter was received by the Whiteheads, but finds that in fact such letter was not a legal acceptance. The court also found that the offer of April 12th was "fair and just and reasonable, and the consideration therefor, namely, the performance by plaintiffs of the terms and conditions thereof, if the same had been performed, would have been an adequate consideration for said offer and for the agreement that would have resulted from such performance; said offer was not, and said agreement would not have been, either harsh or oppressive or unjust to the heirs at law, or devisees, or legatees, of Rupert Whitehead, or to each or any of them, or otherwise".

The court also found that plaintiffs did not know that the statements made by Whitehead in reference to the wills were not correct until after Mrs. Whitehead's death, that after plaintiffs arrived in Piedmont they cared for Mrs. Whitehead until her death and "Blanche Whitehead was greatly comforted by the presence, companionship and association of Caro M. Davis, and by her administering to her wants".

The theory of the trial court and of respondents on this appeal is that the letter of April 12th was an offer to contract, but that such offer could only be accepted by performance and could not be accepted by a promise to perform, and that said offer was revoked by the death of Mr. Whitehead before performance. In other words, it is contended that the offer was an offer to enter into a unilateral contract, and that the purported acceptance of April 14th was of no legal effect.

The distinction between unilateral and bilateral contracts is well settled in the law. It is well stated in section 12 of the American Institute's Restatement of the Law of Contracts as follows:

"A unilateral contract is one in which no promisor receives a promise as consideration for his promise. A bilateral contract is one in which there are mutual promises between two parties to the contract; each party being both a promisor and a promisee."

This definition is in accord with the law of California. (*Christman* v. *Southern Cal. Edison Co.*, 83 Cal. App. 249 [256 Pac. 618].)

In the case of unilateral contracts no notice of acceptance by performance is required. Section 1584 of the Civil Code provides, "Performance of the conditions of a proposal, . . . is an acceptance of the proposal." (See *Cuthill* v. *Peabody*, 19 Cal. App. 304 [125 Pac. 926]; *Los Angeles Traction Co.* v. *Wilshire*, 135 Cal. 654 [67 Pac. 1086].)

Although the legal distinction between unilateral and bilateral contracts is thus well settled, the difficulty in any particular case is to determine whether the particular offer is one to enter into a bilateral or unilateral contract. Some cases are quite clear cut. Thus an offer to sell which is accepted is clearly a bilateral contract, while an offer of a reward is a clear-cut offer of a unilateral contract which cannot be accepted by a promise to perform, but only by performance. (*Berthiaume* v. *Doe*, 22 Cal. App. 78 [133 Pac. 515].) Between these two extremes is a vague field where the particular contract may be unilateral or bilateral depending upon the intent of the offerer and the facts and circumstances of each case. The offer to contract involved in this case falls within this

category. By the provisions of the Restatement of the Law of Contracts it is expressly provided that there is a *presumption* that the offer is to enter into a bilateral contract. Section 31 provides:

"In case of doubt it is presumed that an offer invites the formation of a bilateral contract by an acceptance amounting in effect to a promise by the offeree to perform what the offer requests, rather than the formation of one or more unilateral contracts by actual performance on the part of the offeree."

Professor Williston in his Treatise on Contracts, volume 1, section 60, also takes the position that a presumption in favor of bilateral contracts exists.

In the comment following section 31 of the Restatement the reason for such presumption is stated as follows:

"It is not always easy to determine whether an offerer requests an act or a promise to do the act. As a bilateral contract immediately and fully protects both parties, the interpretation is favored that a bilateral contract is proposed."

While the California cases have never expressly held that a presumption in favor of bilateral contracts exists, the cases clearly indicate a tendency to treat offers as offers of bilateral rather than of unilateral contracts. (*Roth* v. *Moeller,* 185 Cal. 415 [197 Pac. 62]; *Boehm* v. *Spreckels,* 183 Cal. 239 [191 Pac. 5]; see, also, *Wood* v. *Lucy, Lady Duff-Gordon,* 222 N. Y. 88 [118 N. E. 214].)

Keeping these principles in mind we are of the opinion that the offer of April 12th was an offer to enter into a bilateral as distinguished from a unilateral contract. Respondents argue that Mr. Whitehead had the right as offerer to designate his offer as either unilateral or bilateral. That is undoubtedly the law. It is then argued that from all the facts and circumstances it must be implied that what Whitehead wanted was performance and not a mere promise to perform. We think this is a *non sequitur,* in fact the surrounding circumstances lead to just the opposite conclusion. These parties were not dealing at arm's length. Not only were they related, but a very close and intimate friendship existed between them. The record indisputably demonstrates that Mr. Whitehead had confidence in Mr. and Mrs. Davis, in fact that he had lost all confidence in

everyone else. The record amply shows that by an accumulation of occurrences Mr. Whitehead had become desperate, and that what he wanted was the promise of appellants that he could look to them for assistance. He knew from his past relationship with appellants that if they gave their promise to perform he could rely upon them. The correspondence between them indicates how desperately he desired this assurance. Under these circumstances he wrote his offer of April 12th, above quoted, in which he stated, after disclosing his desperate mental and physical condition, and after setting forth the terms of his offer: "*Will you let me hear from you as soon as possible*—I know it will be a sacrifice but times are still bad and likely to be, so by settling down you can help me and Blanche and gain in the end." By thus specifically requesting an immediate reply Whitehead expressly indicated the nature of the acceptance desired by him—namely, appellants' promise that they would come to California and do the things requested by him. This promise was immediately sent by appellants upon receipt of the offer, and was received by Whitehead. It is elementary that when an offer has indicated the mode and means of acceptance, an acceptance in accordance with that mode or means is binding on the offerer.

Another factor which indicates that Whitehead must have contemplated a bilateral rather than a unilateral contract, is that the contract required Mr. and Mrs. Davis to perform services until the death of both Mr. and Mrs. Whitehead. It is obvious that if Mr. Whitehead died first some of these services were to be performed after his death, so that he would have to rely on the promise of appellants to perform these services. It is also of some evidentiary force that Whitehead received the letter of acceptance and acquiesced in that means of acceptance.

*Shaw* v. *King*, 63 Cal. App. 18 [218 Pac. 50], relied on by respondents is clearly not in point. In that case there was no written acceptance, nor was there an acceptance by partial or total performance.

For the foregoing reasons we are of the opinion that the offer of April 12, 1931, was an offer to enter into a bilateral contract which was accepted by the letter of April 14, 1931. Subsequently appellants fully performed

their part of the contract. Under such circumstances it is well settled that damages are insufficient and specific performance will be granted. (*Wolf* v. *Donahue*, 206 Cal. 213 [273 Pac. 547].) Since the consideration has been fully rendered by appellants the question as to mutuality of remedy becomes of no importance. (6 Cal. Jur., sec. 140.)

Respondents also contend the complaint definitely binds appellants to the theory of a unilateral contract. This contention is without merit. The complaint expressly alleges the parties entered into a contract. It is true that the complaint also alleged that the contract became effective by performance. However, this is an action in equity. Respondents were not misled. No objection was made to the testimony offered to show the acceptance of April 14th. A fair reading of the record clearly indicates the case was tried by the parties on the theory that the sole question was whether there was a contract—unilateral or bilateral.

For the foregoing reasons the judgment appealed from is reversed.

Rehearing denied.