[Civ. No. 14145.   First Dist., Div. One.   Dec. 19, 1949.]

WALTER W. PATTY et al., Respondents, v. AMY M. BERRYMAN, as Administratrix, etc., Appellant.

Rogers & Clark and Bruce F. Allen for Appellant.

Bruce M. Parks and Fitzgerald, Abbott & Beardsley for Respondents.

PETERS, P. J.—The administratrix of the estate of E. R. Berryman appeals from a judgment awarding plaintiff, Walter W. Patty, $10,000 for breach of contract, and denying the estate's right to any judgment against Patty and the other cross-defendant, John S. Huston.

The facts are as follows: On, prior, and after November 1, 1946, Huston was the owner of 22 prefabricated houses. On the morning of that day, Patty entered into a contract with Huston whereby Patty agreed to buy, and Huston impliedly agreed to sell, the 22 prefabricated houses for a total purchase price of $53,750, payable $1,000 on November 1st, $4,000 on November 6th, and the balance by December 6, 1946. Patty and his partner Kelly, as Huston well knew, were sales promoters and intended to resell the houses at a profit. Prior to the Huston-Patty contract, Patty had had some oral negotiations with Berryman, so that, when the Huston-Patty contract was signed, Patty knew that he had a purchaser for the houses in the person of Berryman. In fact, a contract between Patty and Berryman in the form of a letter to Patty signed by Berryman and marked "accepted" by Patty was executed on the afternoon of November 1, 1946. Except as to the purchase price, which was $63,800, and for the final date of performance, which was fixed as December 5, 1946, this agreement was in the same form as the Huston-Patty agreement. On November 1, 1946, Berryman paid by check the sum of $1,000 to Patty,

pursuant to the terms of the contract, and Patty endorsed the check over to Huston, pursuant to the terms of the Huston-Patty agreement. When these agreements were executed, Huston did not know of the identity of the purchaser to whom Patty intended to resell the houses, and Berryman did not know Huston. These two parties became acquainted by November 7, 1946, and each then knew of the other's relationship to the transaction. On November 7th, Huston and Patty signed an addendum to their contract extending the time of final payment from December 6, 1946, to January 6, 1947, and on the same date Patty and Berryman signed an addendum to their contract extending the final date of payment from December 5, 1946, to January 5, 1947. When this addendum was signed by Berryman he paid to Patty by check $4,000, which check Patty immediately endorsed over to Huston. All parties involved knew of these transactions.

Berryman intended to resell the houses, and, with the assistance of Patty and Kelly, on November 27, 1946, he entered into a contract with the American Bulb Growers and A. G. Adams to sell the houses to them for $85,800, of which $1,000 was paid to Berryman, the balance being payable June 1, 1947. This contract was terminated by mutual consent of the parties on January 28, 1947.

None of the contracts was ever completed. During November and December, 1946, and up until he died in March of 1947, Berryman was heavily involved financially in other transactions and was just unable to raise any money. Patty and Kelly tried to aid Berryman in finding a purchaser for the houses, and were partially responsible for the Berryman-Adams contract.

Under the terms of the Huston-Patty contract, performance was due by Patty on January 6, 1947, while under the terms of the Patty-Berryman contract, the latter was required to pay the full purchase price to Patty on January 5, 1947. Because of Berryman's default, Patty defaulted in his payments to Huston. Thus the contracts normally would have terminated no later than January 6th. The evidence is not entirely clear as to what happened thereafter, but the most reasonable interpretation of what then occurred is that Huston and Patty both realized that if Berryman could sell the houses they would get their money, and they were loath to terminate Berryman's rights without giving him a full and fair opportunity to perform. There is substantial evidence to the

effect that after January 6th, Huston orally gave several extensions on the time limit for performance, which extensions applied to both Patty and Berryman. After the termination of the Berryman-Adams contract, Patty and Kelly tried to find another purchaser for Berryman and did get several offers, but none higher than $40,000. Berryman died on March 19, 1947, and later in that year Huston succeeded in selling the houses to other individuals for some undisclosed amount.

It is clear that, if the deals had gone through, Huston would have received $53,750 for the houses, and Patty would have received $63,800 for them. Thus, Patty would have realized a profit of $10,050. Huston did get $5,000 and he kept the houses, while Patty lost his $10,050 profit. Patty filed a claim against the estate of Berryman for $10,000, and, upon its rejection, brought this action against the estate of Berryman for the $10,000. The estate answered and cross-complained for the $5,000 paid by Berryman to Patty, naming Patty and Huston as cross-defendants, it being the theory of the cross-complaint that Patty was the agent for Huston.

The trial court found that Patty at no time was acting as the agent of Huston; that Patty was relying on Berryman to perform his contract so that Patty could make good on his contract with Huston; that Berryman was aware of the Huston-Patty contract, and knew that Patty did not have sufficient capital to buy the houses himself; that Patty at all times was ready and able to deliver possession and tendered delivery; that Berryman received adequate consideration under the terms of the contract; that Berryman defaulted, and such default prevented Patty from completing his contract with Huston.

The court concluded that the Patty-Berryman agreement constituted a valid bilateral contract, and that Patty had been damaged to the extent of $10,000, his loss of profit. The court refused any relief on the cross-complaint, and refused to allow any credit on the $10,000 awarded Patty because of the $5,000 payment.

The first major contention of appellant is that the agreement is unenforceable because it contains no promise of delivery on the part of Patty. Appellant seriously urges that the letter amounted to an offer of a unilateral contract which could be accepted only by the act of delivery. A read-

ing of the document demonstrates the error in appellant's position. It reads, in part, as follows:

"San Francisco, California
"November 1, 1946

"Mr. Walter W. Patty
"4103 24th Street
"San Francisco, California

"Re: Purchase of 22 Williamson Prefabricated Houses.

"Dear Mr. Patty:

"I hereby agree to purchase from you twenty-two (22) Williamson Prefabricated Houses hereinafter described, for a total price of $63,800.00, payable $1,000.00 upon delivery of this letter to you, $4,000.00 on or before 12 o'clock noon, November 6, 1946, and the balance at 4103 24th Street, San Francisco, California, on or before 12 o'clock noon on the 5th day of December, 1946, the balance of the purchase price to bear interest at the rate of five percent (5%) per annum after its due date.

"The houses are now in the possession of Western Auto Supply Company, and are of two types, consisting of twenty (20) Williamson 5-room cottage plan No. 400 houses, and two (2) Williamson 5-room cottage plan No. 500 houses.

"Attached hereto and made a part hereof are plans and material lists for the houses above mentioned.

"It is understood and agreed that there is no window glass or roofing material in said material lists, and no flooring for the two Model 500 houses, and it is further understood and agreed that you are not to furnish these materials.

"I agree to take all houses in their present condition, but you are to reimburse me for the reasonable value of any items that may be missing on delivery to me.

"The title to the houses purchased by me under the terms of this agreement shall pass upon their delivery to me at their present storage location and the payment by me of the full balance of their purchase price. All costs of handling, sorting and loading houses on trucks in connection with their delivery shall be paid by me.

"All houses are to be warehoused at my expense after the 1st of November, 1946, and I hereby agree to pay all public warehouse charges accruing thereafter and to pay you for any of these units stored by you a reasonable storage charge of not in excess of $10 per unit per month. . . .

"I shall be entitled to take delivery of units in the order and number that I request only after having paid the full purchase price as aforesaid.

"You shall incur no liability hereunder to me for inability to deliver or for any delay in the delivery of said houses occasioned by governmental action, fires, floods, strikes, labor difficulties, accidents, acts of God or any other similar or different contingencies beyond your control.

"In the event that I fail to complete the payment of the purchase price of these houses within the time aforesaid, you may retain any moneys heretofore paid on the purchase price of said houses as consideration for the execution of the agreement on your part, and as consideration for withholding the houses from sale during the period from the date hereof until the time that I have agreed to pay the unpaid balance of the purchase price of said houses.

"I understand that the said houses as described in the plans and material lists are sold as is and where is and without warranty, express or implied, except warranty of title.

"I agree to pay at the time of paying the balance of the purchase price, any and all sales or use taxes attaching to the sale of said houses from yourself to myself.

"Any notice that you desire or may be required to give or make upon me shall be in writing either delivered personally or sent to me . . .

"If it becomes necessary for you to make any tender to me, the tender may be made in the manner aforesaid and without physically producing or tendering the houses.

"The foregoing, when accepted by you, shall constitute the entire agreement between us.

"If the foregoing is satisfactory to you, please sign and return to me the enclosed duplicate original hereof.

"Very truly yours,

"[Signed]   <u>E. R. Berryman</u>

"E. R. Berryman

"Accepted, and the sum of
$1,000.00 received, November 1, 1946.

"[Signed]   <u>Walter W. Patty</u>

"Walter W. Patty"

"ADDENDUM TO CONTRACT.

"1—Paragraph 1 to be modified to read 'and the balance at 4103 24th Street, San Francisco, California, on or before

12 o'clock noon on the 5th day of January 1947, the balance of the purchase price to bear interest at the rate of 5% per annum after its due date,' with the expressed agreement that we will take a minimum of at least three (3) houses to be purchased and paid for within a period of thirty (30) days.

"2—You will hereby waive lien rights of all houses purchased and paid for from you.

> "[Signed]  E. R. Berryman
> "E. R. Berryman
>
> "[Signed]  Walter W. Patty
> "Walter W. Patty"

It is true that in the above document Berryman made all of the express promises, and that Patty made no express promise. But a promise to sell on the part of Patty is necessarily implied. The letter identifies the property to be purchased, fixes the purchase price and sets forth the terms of the proposed transaction in minute detail. Patty wrote "accepted" on the letter, and signed his name. What else could the term "accepted" mean except that he agreed to the terms set forth, and necessarily agreed to sell on those terms? If authority is necessary to establish such an obvious conclusion, it can be found in the cases of *Gregg* v. *McDonald,* 73 Cal.App. 748 [239 P. 373], and *Herrlein* v. *Tocchini,* 128 Cal.App. 612 [18 P.2d 73]. In the first of these cases, at page 754, the court stated: "It is uniformly held that the obligation of a party need not be expressly stated in the contract but may be inferred from the undertakings of the other party. Thus it has been held that where one party agrees to buy from the other and nothing is expressly said as to the obligation of the latter to sell, such obligation to sell may be implied. (*Thomas-Huycke-Martin Co.* v. *Gray,* 94 Ark. 9 [125 S.W. 659, 140 Am.St.Rep. 93].)"

In the second case above cited, at page 620, the court stated: "It cannot be denied that the escrow agreement was clumsily drawn and that paragraph three thereof lends color to appellants' claim with respect to an option. Then, too, there is no explicit promise on the part of respondent Herrlein to sell, or on the part of the appellant Tocchini to buy. . . . However, it seems not to be so lame with respect to the mutual obligations of the parties as appellants profess to believe. The parties are designated as buyer and seller, the price is named and the property identified. In these circumstances it may

be implied that Herrlein agreed to sell and that Tocchini agreed to buy.''

If doubt existed as to whether the agreement was bilateral or unilateral, such doubt would have to be resolved by interpreting the agreement to be bilateral, thus protecting both parties, rather than unilateral, which would protect neither. There is a presumption in favor of interpreting ambiguous agreements to be bilateral rather than unilateral. (*Davis* v. *Jacoby*, 1 Cal.2d 370, 379 [34 P.2d 1026] ; *Woodbine* v. *Van Horn*, 29 Cal.2d 95, 104 [173 P.2d 17] ; Restatement of Contracts, § 31; 1 Williston on Contracts, § 60.)

The cases cited by appellant on this issue—*California R. Co.* v. *Producers R. Corp.*, 25 Cal.App.2d 104 [76 P.2d 553] ; and *Foley* v. *Euless*, 214 Cal. 506 [6 P.2d 956]—are not in point. Neither case involved the question here presented. In both cases, the quantity involved depended upon the whim or caprice of one of the contracting parties. In each case there was an illusory promise—that is, no promise at all. It is elementary, of course, that where performance is optional with one of the parties, or where the quantity involved rests in the sole discretion of one of the parties, no enforceable obligation exists. In the instant case, unlike the two cited cases, the quantity involved—22 designated houses—was clearly fixed, and the price and terms of sale were set forth in minute detail. None of the promises here involved was illusory. (*Woodbine* v. *Van Horn*, 29 Cal.2d 95, 105 [173 P.2d 17].)

Both parties discuss at some length the question as to whether or not the record shows Berryman received valid oral extensions of the time of performance under his contract after January 6, 1947. It is the theory of the appellant that the record shows that Berryman received extensions up to the time of his death on March 19, 1947, but that the Huston-Patty contract terminated January 6, 1947. Hence, it is argued that Patty could not perform after January 6th, and could not thereafter place Berryman in default. The evidence in reference to these oral extensions is quite confusing. Huston testified in his deposition that Patty was in default after January 6, 1947, but he also stated that Patty was given oral extensions after that time. Patty's testimony is likewise ambiguous. He first testified that his interest in the houses terminated on January 6th, but he also testified that after that date he offered to deliver the houses to Berryman, and that Huston agreed with Berryman and Patty that, if Berry-

man could sell one or more of the houses, he, Huston, would "credit Mr. Berryman with that towards the contract, up until Mr. Berryman's death." Patty also testified that Huston gave oral extensions directly to Berryman after January 6th, and that such extensions applied to him also. While the testimony on this issue is certainly ambiguous, a reading of the record leads to the conclusion that Huston, Patty and Berryman, before and after January 6th, knew that Berryman could not perform unless he sold the houses, and all three cooperated to accomplish this purpose. Neither Huston nor Patty was desirous of terminating the contract on January 6th, and were desirous of giving Berryman every reasonable opportunity to perform. To this end, Huston gave Patty oral extensions, thus enabling Patty to give extensions to Berryman. Undoubtedly, these extensions were not given in any formal way. Huston was anxious to get rid of the houses and frequently talked with both Patty and Berryman, and these extensions were usually granted during these conversations. Thus, both contracts were in force and effect on the death of Berryman and at that time there was a default under the Patty-Berryman contract.

The appellant finds herself on the horns of a dilemma so far as this point is concerned. If there were valid extensions, such extensions applied to both contracts. On the other hand, if there were no valid extensions, the default occurred January 6, 1947, and Patty was then damaged to the extent of $10,050—his anticipated profit. Berryman's then default caused Patty to lose his interest in the houses under the Huston-Patty contract. In either event, Berryman defaulted. Whether that default took place in January or occurred in March is immaterial. In either event, the measure of damages would be the same.

█ Appellant next contends that delivery of the houses and payment of the purchase price were concurrent conditions and that, since at no time could Patty have delivered the houses had Berryman paid him the purchase price, because Patty would first have to pay Huston, Berryman was never in default. Appellant contends that section 1439 of the Civil Code compels such a holding. That section provides, in part: "Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must be able and offer to fulfill all conditions concurrent so imposed upon him on the like fulfillment by the other party . . ."

While it is true that, in the ordinary purchase and sale agreement, payment of the purchase price and delivery of the goods are concurrent conditions, that rule is not strictly applied where the buyer knows the seller does not own the goods involved when the contract is executed. The trial court found, and the finding is supported, that Berryman knew of the Huston-Patty contract as early as November 7, 1946. It is also a found fact, supported by the evidence, that Berryman knew that Patty endorsed the checks given to him by Berryman over to Huston as payments on the Huston-Patty contract. Berryman knew that Patty had to get title from Huston, and Patty could have done this in a very few moments. Berryman made no objection at any time that Patty did not have title to the houses. By his silence he waived any right to object.

Where a seller contracts to sell property he does not own, the law applies a common sense rule that a seller is allowed a reasonable time after payment by the buyer during which he can purchase the goods required to meet his promise. (*Darr* v. *Clevelin Realty Corp.*, 33 Cal.App.2d 500, 504 [92 P.2d 475]; *Ellwood* v. *Niedermeyer*, 12 Cal.App.2d 699, 704 [56 P.2d 279]; Restatement of Contracts, § 269.) In such cases the seller probably must have some interest in the goods. He cannot, when the buyer tenders the purchase price, then, for the first time, commence to acquire the property. But here Patty had the houses tied up by his contract with Huston, and simply had to pay Huston to complete his title. (See 25 Cal.Jur. § 25, p. 495.)

The appellant cites *Brant* v. *Bigler*, 92 Cal.App.2d 730 [208 P.2d 47]. That was an action for declaratory relief brought by the seller on an agreement involving the sale of real property. The facts are similar to those here, in that the seller did not have title to the land sold, but was relying upon the use of the buyer's money in order to be able to purchase the property. Each of the transactions in which the seller was involved was in the form of an escrow. He gave instructions to the Santa Monica escrow company, which was the depository of defendant buyer's funds, to transfer the money to a company in Glendale through which he was purchasing the property. The seller was denied relief, the court stating that the buyer had not consented to the simultaneous escrow device, and therefore the Santa Monica escrow company could not lawfully have made the transfer. The only way that de-

fendant buyer could have been placed in default was for the seller to have placed the deed in the Santa Monica escrow. The case is clearly distinguishable from the instant one. Obviously, the Santa Monica escrow company could not have complied with the seller's instructions to transfer the money to the Glendale company without breaching its fiduciary duty owed to the purchaser. Moreover, as the court pointed out, the case involved an attempted forfeiture, and so, of course, the court tended to that view which would avoid the forfeiture.

One of the attorneys for appellant testified that Huston telephoned him on December 28, 1946, and demanded to know if Berryman was going to perform his agreement with Patty. The attorney stated that he told Huston that Berryman was in no financial position to perform. Thereupon, Huston threatened suit, and threatened that, unless Berryman paid him $10,000 for a release, he would sue. Appellant seeks to make much of this incident, claiming that this was a repudiation—an anticipatory breach—of the contract by Berryman, and demonstrates that the Patty-Berryman contract was not extended. In view of the evidence heretofore set forth of the conversations between Berryman, Patty and Huston, it is obvious that the parties did not treat this as a breach. If any breach occurred, it was waived. Moreover, the conversation was with Huston, not with Patty. Just how a conversation with Huston, with whom Berryman had no contractual relations, could constitute an anticipatory breach of the contract between Berryman and Patty, does not appear. Section 318 of the Restatement of Contracts, in illustration No. 3, gives the following example: "A and B enter into a bilateral contract to sell and buy goods during the following month. Before the time for performance arrives, A tells C, a third person having no right under the contract, that he intends not to carry out his contract with B. C informs B of this conversation, though not requested by A to do so. A has not committed an anticipatory breach."

The last major point urged by appellant is that the trial court applied the wrong measure of damage, and erroneously refused to allow appellant a $5,000 setoff. On the issue of damages the trial court found that: "It is further a fact that at all times herein mentioned from and after November 7, 1946, decedent knew that default by him under, and failure on his part to pay and perform under, his agreement with plaintiff, Exhibit 'A' to the complaint, would directly cause a default on plaintiff's part under plaintiff's contract as

buyer, with John S. Huston, as seller, since decedent knew, as the fact was, that such default on decedent's part when coupled with the prompt necessity on plaintiff's part of making payment to John S. Huston under plaintiff's contract, as buyer, with Huston, as seller, would not afford plaintiff sufficient time either to procure the necessary funds to make payment on his contract with Huston or permit plaintiff sufficient time to effect a further sale of said houses, or any thereof, to any third person, since plaintiff believed and knew on or about January 5, 1946, and for some time prior and subsequent thereto that there was no immediately available or ready market for the sale of said . . . houses but instead plaintiff knew, as the fact was, that said . . . houses could only be sold at or about said times for a price in excess of $40,000 or $50,000 as the chance result of happening to find a person, . . . who had a particular need or desire therefor at the time.''

This finding clearly applied the correct measure of damages. The general rule is that for breach of contract, the injured party is entitled to damages in such amount as ''will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.'' (Civ. Code, § 3300.) Berryman obviously knew that Patty expected to make a profit on the deal. The loss of that profit was proximately caused by Berryman's failure to perform. (*Hacker etc. Co.* v. *Chapman V. Mfg. Co.,* 17 Cal.App.2d 265, 267 [61 P.2d 944].) Section 1784 of the Civil Code is the section providing the measure of damages where the buyer wrongfully neglects to accept and pay for goods. Subdivision 2 provides that: ''The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract.'' Subdivision 3 provides that where there ''is an available market for the goods in question, the measure of damages is, in the absence of special circumstances, showing proximate damage of a greater amount, the difference between the contract price and the market or current price.'' This section obviously applies where the seller has the goods and retains them after the default. But it has no application to a situation where the seller is a middleman and everyone knows his profit depends upon the difference in his purchase and selling price. Therefore, there are ''special circumstances'' here present that make market value a false factor. Moreover, the trial court found, and the finding is supported,

that during the times here involved there was no ready or available market for the houses.

Contrary to appellant's argument, the market value of these houses at any time is an immaterial factor. The damages to Patty had no relation to market value and were totally unaffected by such value. Whether the market value of the houses was $40,000 or $100,000 would not affect his damage. In either event, his loss was the difference between his contracted for purchase price—$53,750—and his contracted for sales price of $63,800, or $10,050.

The case of *Rice v. Schmid*, 18 Cal.2d 382 [115 P.2d 498, 138 A.L.R. 589], relied upon by appellant, is not in point. That case held that, under section 1784 of the Civil Code, the proper measure of damages was the difference between the market and contract prices in a case where the plaintiff contracted to buy flour and at the same time contracted to sell flour to the defendant who subsequently failed to perform. That case dealt with a brand name flour, and the contract provided that the seller should procure the "flour of the specified brands, whether from the miller or on the market." (P. 388.) In the instant case, the houses were a definite product not available on the general market. Moreover, unlike the flour case, in the instant one the court found that there was no market available for the houses.

■ Appellant contends that, in any event, she is entitled to a credit on the $10,000 judgment for the $5,000 already paid Patty, on the theory that a buyer in default should be credited for payments on the purchase price already made to and retained by the seller. (*Gopcevic v. California Packing Corp.*, 64 Cal.App. 132, 141 [220 P. 1078].) That principle has no application here. The $5,000 paid by Berryman to Patty was immediately turned over by Patty to Huston in order that Patty could perform under the Patty-Berryman contract, and Berryman knew that the money was to be so used. The expenditure of the $5,000 was reasonably necessary in order to preserve the rights of all concerned. The proper rule of law is thus expressed by McCormick in his Handbook on the Law of Damages, page 582, as follows: "Reasonably necessary expenditures incurred, and the value of services rendered, by the contracting party not in default, may be recovered as damages for breach of contract, wherever the plaintiff has not also recovered the full price or the value of the benefits expected under the contract. . . . In addition to expenses, the plaintiff is entitled to the net profit he would have made upon

the entire contract, if he can establish it. The net profit is the contract price less the total amount of expenditures, including those already incurred, which the plaintiff would have made from the beginning to the end of the contract.''

Patty is entitled to be made whole. Had Berryman performed, Patty would have had $10,050 (reduced by the claim filed with the estate to $10,000) net. If Berryman is credited with the $5,000, obviously Patty will only have $5,000 of his expected $10,000 profit. Actually, the court allowed a credit to Berryman's estate. Properly computed, the damages are as follows:

Patty's loss of expected profit due to breach.....$10,000
Patty's necessary expenditures to enable him to
    perform on the Berryman contract............  5,000
                                                  ────────
Total damages ...............................$15,000
Credit to Berryman's estate for payments.......  5,000
                                                  ────────
Total damage ......................................$10,000

The judgment appealed from is affirmed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied January 18, 1950, and appellant's petition for a hearing by the Supreme Court was denied February 16, 1950. Shenk, J., and Edmonds, J., voted for a hearing.