[Civ. No. 25388. Second Dist., Div. One. Sept. 1, 1961.]

LOS ANGELES COIN-O-MATIC LAUNDRIES, Respondent,
v. M. IRA HAROW, Appellant.

Martin B. Berman for Appellant.

Caditz & Grant and Harvey F. Grant for Respondent.

LILLIE, J.—Plaintiff, assignee of an agreement for the sale of a commercial automatic laundry system, sued for breach of contract; defendant appeals from the judgment entered in favor of plaintiff for $3,219.93.

We view the evidence in the light most favorable to the respondent. (*Primm* v. *Primm,* 46 Cal.2d 690 [299 P.2d 231]; *Grainger* v. *Antoyan,* 48 Cal.2d 805 [313 P.2d 848].) Defendant owned a lot upon which he planned to construct a building and install a coin-operated laundromat; his contractor advised him he could not develop the plans without the assistance of a specialist. In March 1959, defendant sought the services of plaintiff's predecessor, a firm known as Coin-O-Matic Laundries, a franchised dealer for Frigidaire Sales Corporation and experienced in the installation of commercial automatic laundry systems, hereinafter referred to as plaintiff. Defendant asked plaintiff to assist his builder and architect with his plans; plaintiff advised him that it rendered such services only in connection with the sale and installation of equipment and would not do so unless he signed a sales agreement and deposited $500. Thus, on March 27, 1959, a form of sales agreement was mailed by plaintiff to defendant for his signature; defendant signed the same and returned it with his check for $500, which plaintiff deposited in its account. The agreement (Exhibit 1) provided for the sale, delivery and installation of certain specified automatic laundry equipment on defendant's premises. Thereafter, plaintiff met with defendant's builder and architect, determined the capacity of the premises for equipment, made plumbing and boiler lay-outs, investigated the matter of waste disposal, advised on wiring requirements and made a store lay-out. These lay-outs were utilized in the building. Plaintiff also arranged for delivery of each type of equipment mentioned in the sale agreement to defendant's premises at the time the

building was expected to be completed. Most items were available on short notice; no equipment required to fill the order had actually been purchased by plaintiff, but it did all that was necessary to arrange for its delivery when defendant was to be ready for it and to prepare for its installation. In June 1959, defendant decided that the cost would be more than he had anticipated, and at the end of August informed plaintiff he might not want the equipment. On August 31, 1959, defendant started construction of the building; several days later, on September 2, defendant, in writing, instructed plaintiff to ''cancel my order and sales agreement dated 3-27-59. Also please refund my $500. deposit.''

Appellant's main complaint goes to the matter of damages. He argues first that Findings of Fact, Numbers 3 and 10, go beyond the issues, resulting in a partial judgment for services rendered plus damages for breach of contract. The trial court found (Finding No. 3) ''As an essential element of said Agreement and in accordance with the understanding of both parties, the plaintiff's assignor was obligated to and did render substantial consulting and engineering services to defendant's builder and architect in connection with the installation of said equipment'' and (Finding No. 10) ''Had plaintiff purchased said equipment at the time required to perform under the contract, the cost to plaintiff would have been $3,719.93 less than the contract price; and as a result of defendant's breach, plaintiff was damaged in said sum of $3,719.93 less the sum of $500 . . .'' Appellant says that *if* there is included in the $3,219.93 judgment a sum for consulting and engineering services, that sum was outside of the issues framed by the pretrial order and not recoverable by plaintiff for breach of contract for sale of merchandise.

Nothing in the record supports such an argument. It is clear from the evidence that the damages awarded ($3,219.93) consisted solely of the profit plaintiff would have made had the sale of the equipment been effected and defendant accepted it. While it is true that certain consulting and engineering services were necessary on the part of plaintiff to enable it to fulfill its obligations under the contract of sale, any suggestion that the $3,219.93 judgment included services rendered, plainly ignores the evidence. The record sets up in detail the cost of the equipment to plaintiff, had it purchased the same from the manufacturer at the time plaintiff was required to perform under the contract, and the contract price to defendant—supported by the testimony of Mr. Moster

—(partner in plaintiff firm), invoices from Frigidaire Sales Corporation, Cissell Manufacturing Company, Huebsch Manufacturing Company, Ace Tank and Heater Company, and Standard Change-Makers Inc. (Exhibit 5), and a summary (Exhibit 4) showing the total cost of the equipment listed in the sales agreement (24 Frigidaire Washers and Cissell Meters, 6 Huebsch Gas Dryers, 2 Ace Gas Heaters, 1 Ace Galvanized Water Tank, 2 Standard Coin Changers and 1 pump, acquastat thermometer) to be $7,977.07 and the contract price to defendant to be $11,697.00. The difference in the two sums, amounting to a profit of $3,719.93 had nothing to do with the value or price of any service rendered preparatory to delivery and installation of the equipment under the contract; it represented strictly profit from the sale of merchandise; the $500 deposit in the possession of plaintiff was deducted therefrom leaving a judgment of $3,219.93.

Further, Findings 3 and 10 are not outside the issues. The pretrial order declared a dispute to exist relative to the nature and legal effect of the sales agreement; the joint pretrial statement specified the issues—whether the agreement is valid and binding (par. 1) and whether plaintiff performed all conditions precedent (par. 4). The trial court found that the execution and delivery by defendant of the agreement constituted an acceptance of plaintiff's offer to sell, install and provide consulting services and supervision necessary to install the commercial automatic laundry equipment listed therein (No. 1); that the parties agreed delivery of the equipment listed therein would be made upon completion of defendant's building (No. 4); and that while plaintiff did not acquire the equipment, it had arranged for it to be available in sufficient time to meet its obligations under the contract (No. 7); and concluded that a valid and binding contract existed for the sale and installation of equipment and the rendering of consulting services. Finding Number 3 bears not only on the lower court's interpretation of the agreement and its conclusion that it is a valid and binding one, but upon the issue of plaintiff's performance of the conditions precedent. Extensive testimony was received in the court below relative to the services sought by defendant and rendered by the plaintiff. Had appellant felt this to be outside the issues it was incumbent upon him to then voice his objection; he not having done so and the evidence thereon having been treated by both parties and considered by the lower court as an issue in the case, appellant will not now be

heard to complain for the first time that a finding made thereon must be disregarded as outside the pleadings. (*Vaughn* v. *Jonas,* 31 Cal.2d 586 [191 P.2d 432]; *Cross* v. *Bouck,* 175 Cal. 253 [165 P. 702]; *McDougald* v. *Hulet,* 132 Cal. 154 [64 P. 278].)

 Appellant contends that the complaint alleged that plaintiff fully performed all conditions precedent (par. 8), but that the trial court found it did not actually acquire the equipment necessary to perform the contract, thus, it is attempting to recover on an "incompleted contract" wherein plaintiff did not perform all conditions precedent imposed upon it. Plaintiff sought damages for breach of contract by "defendant's refusal to accept delivery." (Conclusions of Law, No. 2.) The evidence shows that plaintiff performed all conditions precedent imposed upon it which it was able to perform; the trial court specifically found that plaintiff was obligated to and did render substantial consulting and engineering services to defendant's builder and architect in connection with the installation of the equipment (No. 3), and that while it did not acquire the equipment necessary to perform the contract (No. 7), since the parties had agreed that delivery of the equipment would be made upon completion of defendant's building (No. 4), plaintiff "had arranged for said equipment to be available in sufficient time to meet its obligations under the contract" (No. 7); and that defendant repudiated the contract on September 2, 1959 (No. 6), before completing the building. Thus the conditions precedent imposed upon plaintiff were—rendering consulting and engineering services, arranging for the equipment to be available upon completion of the building, delivering the equipment at that time and installing the same. Plaintiff rendered the services, arranged for the delivery of the equipment, and did all it could under the contract before the completion of the building, but before the building was completed so that it could perform the other conditions precedent—deliver and install the equipment—defendant repudiated the contract. The exception contained in section 1439, Civil Code, and set forth in section 1440 provides: "If a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party."

Error is asserted in the trial court's conclusion that there was a valid and binding contract, in that the price of the equipment agreed upon was subject to change by plaintiff upon approval of defendant; plaintiff never obtained possession or title to the equipment or had any definite arrangements for obtaining it; and plaintiff never signed the agreement on the "approval line," showing its lack of intent to be bound.

We know of no authority to the effect that if a price fixed in a contract is subject to change by mutual consent of the parties, the contract is rendered indefinite and uncertain or lacking in mutuality, nor has appellant referred us to any. Appellant's claim that plaintiff had no definite arrangements for obtaining the equipment overlooks the evidence and the trial court's finding thereon that it "had arranged for said equipment to be available in sufficient time to meet its obligations under the contract" (No. 7), which finding appellant not only has not questioned, but himself relies upon. It is true that plaintiff on the date of repudiation had not acquired the equipment, but it was not obligated under the terms of the contract to do so prior to delivery and delivery was to be made to defendant's premises upon completion of the building (No. 4). The repudiation took place before the building was completed. Further, section 1725, subdivision (1), Civil Code, permits one to agree to sell merchandise to which he does not have title at the time the contract is entered into. The "approval" line referred to by appellant, appears to be of significance only when the order is taken by a salesman (here it was taken by an owner), or when a finance plan is entered into (here the terms were "Cash on Delivery").

Nevertheless, the acts of performance of plaintiff under the agreement (sending the contract to defendant and requesting he sign it and return it with a $500 deposit, keeping the signed document, depositing the $500 check, planning for the installation and arranging for its delivery when necessary) constitute much stronger evidence of intent to be bound than the absence of a signature on the "approval" line constitutes lack of intent to be bound.

Appellant claims the trial court applied the wrong measure of damages and erred in not following section 1784, subdivision (3), Civil Code. The trial court found that "[p]laintiff acted as a middleman and dealer whose profit is made by buying equipment from a manufacturer and selling it to a user at a higher price. This fact was known to defendant" (No. 9), and "[h]ad plaintiff purchased the

equipment at the time required to perform under the contract, the cost to plaintiff would have been $3,719.93 less than the contract price; and as a result of defendant's breach, plaintiff was damaged in said sum of $3,719.93 less the sum of $500.00 theretofore paid to plaintiff's assignor by defendant'' (No. 10); and concluded that defendant breached the contract by his refusal to accept delivery of the equipment (No. 2) and that the measure of damages is set by section 1784, subdivision (4), Civil Code, and is the difference between the contract price and what said equipment would have cost plaintiff at the time plaintiff would have been required to purchase it (No. 3). The trial court clearly applied the correct measure of damages; section 1784, subdivision (3) is not applicable.

Section 1784, Civil Code, provides the measure of damages where the buyer wrongfully neglects to accept and pay for goods. Subdivision (2) provides that ''The measure of damage is estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract''; subdivision (3) provides that where there ''is an available market for the goods in question, the measure of damages is, in the absence of special circumstances, showing proximate damage of a greater amount, the difference between the contract price and the market or current price''; and subdivision (4) provides ''If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell . . ., the buyer repudiates the contract . . . [t]he profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages.''

Two factors necessary for the application of subdivision (3) are—an ''available market for the goods in question'' and ''the absence of special circumstances, showing proximate damage of a greater amount''; the trial court found there is no available market for the equipment and that plaintiff was a middleman, a special circumstance under subdivision (3). (*Patty* v. *Berryman,* 95 Cal.App.2d 159 [212 P.2d 937].) This case involved a situation in which the buyer (defendant) contracted to buy prefabricated houses he knew the seller (plaintiff) did not own; the plaintiff, however, had contracted with a third party to buy the houses and the defendant had agreed with plaintiff to pay him for the houses on the day before the plaintiff under his contract to buy the houses was to complete their purchase from the

third person. The court found there was no available market at that time for prefabricated houses and that plaintiff was a middleman, rejected the measure of damages set forth in subdivision (3), and held that a seller who is a middleman or dealer may recover the difference between the contract price and what the goods would have cost him. The court said at page 171: "The general rule is that for breach of contract, the injured party is entitled to damages in such amount as 'will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.' (Civ. Code, § 3300.) Berryman obviously knew that Patty expected to make a profit on the deal. The loss of that profit was proximately caused by Berryman's failure to perform (*Hacker, etc. Co.* v. *Chapman Valve Mfg. Co.*, 17 Cal.App.2d 265, 267 [61 P.2d 944].)" Citing section 1784, subdivision (2) and (3), the court further continued: "This section obviously applies where the seller has the goods and retains them after the default. But it has no application to a situation where the seller is a middleman and everyone knows his profit depends upon the difference in his purchase and selling price. Therefore, there are 'special circumstances' here present that make market value a false factor. Moreover, the trial court found, and the finding is supported, that during the times here involved there was no ready or available market for the houses.

"Contrary to appellant's argument, the market value of these houses at any time is an immaterial factor. The damages to Patty had no relation to market value and were totally unaffected by such value. Whether the market value of the houses was $40,000 or $100,000 would not affect his damage. In either event, his loss was the difference between his contracted for purchase price—$53,750—and his contracted for sales price of $63,800, or $10,050."

*Rice* v. *Schmid*, 18 Cal.2d 382 [115 P.2d 498, 138 A.L.R. 589], holding that under subdivision (3) the proper measure of damages was the difference between the market and contract price, is not here applicable; the commodity was a brand name flour; defendant refused to accept delivery. The court said at page 388: "Since he [plaintiff] was free to wait and procure flour at the market price when ordered by the buyer, he is entitled to recover as damages the profits which he would have made in that event, the difference between the market price and the contract price." The court in *Patty* v. *Berry-*

*man,* 95 Cal.App.2d 159 [212 P.2d 937], also rejected *Rice* v. *Schmid,* 18 Cal.2d 382 [115 P.2d 498, 138 A.L.R. 589] as not in point; ''That case dealt with a brand name flour, and the contract provided that the seller should procure the 'flour of the specified brands, whether from the miller or on the market.' (P. 388.) In the instant case, the houses were a definite product not available on the general market. Moreover, unlike the flour case, in the instant one the court found that there was no market available for the houses.'' (P. 172.)

Appellant's contention that the finding that there was no available market for the equipment (No. 8) and that plaintiff was a middleman (No. 9) are unsupported by the evidence, is without merit. The merchandise in the instant situation is not a staple commodity such as flour (*Rice* v. *Schmid,* 18 Cal.2d 382 [115 P.2d 498, 138 A.L.R. 589]), milk (*O'Hare* v. *Peacock Dairies, Inc.,* 26 Cal.App.2d 345 [79 P.2d 433]) or hops (*Pabst Brewing Co.* v. *E. Clemens Horst Co.,* 229 F. 913), but a product, because of its very nature, not available on the general market. (*Patty* v. *Berryman,* 95 Cal.App.2d 159 [212 P.2d 937]; *Walpole* v. *Prefab Mfg. Co.,* 103 Cal. App.2d 472 [230 P.2d 36]; *Southern Pacific Mill. Co.* v. *Billiwhack, etc. Farm,* 50 Cal.App.2d 79 [122 P.2d 650].) It consists of equipment which is not, and cannot be, sold without the supplier installing the same, which is sold largely through the medium of advertising, promotion and referral, the availability of which is limited by its manufacturer to special franchise dealers, and the manufacturer of which sells it only at wholesale price to dealers such as plaintiff who sell it at retail; and the evidence bears this out. Mr. Moster, a partner in plaintiff firm ''qualified as an expert, as a dealer'' testified that the washers (the main item of equipment) were commercial washers, used solely for laundromats and launderettes and because of their attending equipment and coin operation cannot be sold or utilized for home use; that dealers ''rarely ever'' stock commercial washers for they would be difficult to sell to anyone except a retail customer like defendant who wants to install a commercial automatic laundry system; that the manufacturer exercises control over the disposition of washers, and only two dealers in Los Angeles, of which plaintiff is one, are authorized to sell Frigidaire washers: that other people cannot buy washers at the price a dealer buys them; that a dealer cannot go out and sell them to anyone, for as commercial equipment, they are useless unless a meter with a timer is obtained from Cissell and the

only available market for them would be another retail customer such as defendant (laundromat) who can be found only by advertising, recommendation or referral; and that it is very hard to sell equipment to laundromats for they have already had their own equipment installed and any sale would have to be to a new laundromat that "is going in." Mr. Olson testified that installing an automatic laundry system is highly specialized work; that no sale can be made without detailed installation planning; and that the installation and planning cannot be done by an architect or builder. It is evident that no "available market" within the meaning of subdivision (3) exists for commercial automatic laundry equipment of this type, and the court's finding thereon is amply supported by the evidence.

But as in the *Berryman* case, there is a "special circumstance" here present that makes market value a false factor, for the trial court found, supported by the evidence, that plaintiff was a middleman. While appellant questions this finding as unsupported by the evidence, he does not dispute that plaintiff was a dealer, its profit was made by buying equipment from the manufacturer and selling it to a user at a higher price and that defendant knew this. The evidence shows that plaintiff, a franchised dealer for Frigidaire Sales Corporation, works strictly on a profit basis selling equipment at higher prices than it pays for it; that the manufacturer delivers directly to the owner and it maintains no showroom, inventory or display; and that plaintiff never received possession of the merchandise or title thereto prior to delivery. Plaintiff was an intermediary between manufacturer and consumer. The term "middleman" as used in the *Berryman* case, *supra,* in connection with subdivision (3), is synonymous with dealer—one who buys at one price from a manufacturer for resale at a higher price. In *Patty* v. *Berryman,* 95 Cal. App.2d 159 [212 P.2d 937], the plaintiff from whom defendant contracted to buy 22 prefabricated houses, had contracted to obtain them from a third party. Referring to plaintiff as a middleman the court continued that subdivision (3), section 1784, Civil Code "has no application to a situation where the seller is a middleman and everyone knows his profit depends upon the difference in his purchase and selling price."

Without argument or citation of authority, appellant says the trial court erred in refusing to permit the introduction of evidence concerning other cancellations—"records of respondent containing numerous purchase orders signed by

various customers and marked void'' showing plaintiff's lack of intent to regard the sales agreement a binding contract. The records referred to are entirely devoid of probative value, and their exclusion from evidence was proper. There is nothing in the record to show these purchase orders were ''signed by various customers''; the records contained copies of plaintiff's order to manufacturers and not orders to plaintiff from customers; any voiding of the orders to manufacturers was nearly always the result of a clerical mistake in filling out the form; and none of the voided orders constituted cancellations.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied September 20, 1961, and appellant's petition for a hearing by the Supreme Court was denied October 25, 1961.